JOSEPH HENDRICKSON v. THOMAS L. SHOTWELL and ELIZA-
BETH his wife—*On bill for relief, &c.*

THOMAS L. SHOTWELL v. JOSEPH HENDRICKSON and STACY
DECOW—*On bill of interpleader, &c.*

The court of chancery, and every other court in New-Jersey, has the power
and the right, to ascertain by competent evidence, what are the religious
principles of any man or set of men; when civil rights are thereon to de-
pend, or thereby to be decided. Page 633.

This court cannot inquire into the doctrines and opinions of any religious so-
ciety, for the purpose of deciding whether they are right or wrong; but
may inquire into them as facts pointing out the ownership of property.—
Pages 671, 682.

If a fact be necessary to be ascertained by the court, for the purpose of set-
tling a question of property, it is the duty of the court to ascertain it; and
this must be done by such evidence as the nature of the case admits of.—
Page 679.

If the doctrines held by any religious society be important in determining a
question of property; the party who would avail themselves of their doc-
trines, must prove them. Page 682.

Where a fund was raised by members of a religious society known as "the
Chesterfield Preparative Meeting of the Society of Friends, or people call-
ed Quakers, at Crosswicks," for the declared purpose, "that the principal
should remain a permanent fund, under the direction of the trustees of the
school at Crosswicks, to be chosen by the said Preparative Meeting; and
the interest should be applied to the education of such children as then or
thereafter should belong to the same Preparative Meeting, whose parents
should not be of ability to pay for their education;"—this fund may not be
divided, as often as this body shall separate, and parts of it diverted from
its declared purpose, and appropriated to the education of children of per-
sons connected with other religious persuasions. Page 670.

The trust can be exercised, only, by a meeting of the religious *society of
Friends;* and the fund can be used, only, for the education of children of
persons belonging to a meeting of that society. Page 670.

It is a body of Friends, with their settled and known characteristics at that
time, which is contemplated in the trust. Page 671.

It is proper and legal, that the court should notice the doctrine of the Prepara-
tive Meeting which is to superintend the expenditure of this fund. Page 683.

A separation of a portion of the religious society of Friends constituting the
yearly meeting of the society, from that meeting, does not necessarily de-
stroy or impair it, nor as it respects its legal existence, even weaken the
original institution. Page 652.

A portion of any religious society cannot disfranchise the rest, declare the
society dissolved, erect among themselves a new body within the limits of
the ancient society, and declare that to be the ancient society. Pages 644-5-6.

73

Where an officer of a religious society was duly appointed, and the term of his office does not cease by limitation of time, the presumption is that he remains in office, until competent evidence of his due removal is given : and whoever claims on the ground that his office has ceased, must establish it by lawful and sufficient proof. Page 600.

When a majority of an elective body protest against the election of a proposed candidate, and do not propose any other candidate, the minority may elect the candidate. Page 621.

*Semble*. That where a donation is made for the use of a certain religious society at a particular place, the right is local and vests in such religious society at that place : it also vests in a society at that place, of the same religious persuasion, holding and professing the same religious opinions, doctrine and belief; and if that society should become divided in religious opinion, and separate into two distinct bodies, holding different doctrines, the right of property would remain with that portion of the society which held the same religious opinions, doctrine and belief, which the original society held at the time the donation was made, without regard to the fact whether they were a majority or minority of the members of the original society.

THE controversy in this case, which arose upon a bill for the foreclosure of a mortgage, grew out of a difference of religious views and feeling that had arisen in the society of Friends, and excited a deep interest among a large and respectable portion of the community. This society had its origin in England about the middle of the seventeenth century, and was introduced into this country by some of the early settlers in New-Jersey and Pennsylvania. Primary meetings, for worship, were first formed by members of the society residing near each other ; a monthly meeting was soon after formed in the county of Burlington ; and upon invitations from this monthly meeting, to other meetings and members of the society, they met at Burlington, on the third first-day of sixth month, (June,) A. D. 1681, and formed the first yearly meeting of the society of Friends. This meeting was increased and enlarged by the association of other meetings and members of the society, until it comprehended all the members of the society, and their meetings and judicatories of inferior grade, in the then provinces of New-Jersey and Pennsylvania. It corresponded with other bodies of the same religious society in other provinces, and with the yearly meeting of the society of Friends in London : by which it was recognized as a yearly meeting of the society of Friends.

July, 1832.

Hendrickson
v.
Decow.

The yearly meeting thus established, from 1684 to 1761 was held alternately at Burlington and Philadelphia: since that period it has been held altogether in Philadelphia. The day of meeting has been several times changed, until 1798, since which period, by a rule of the meeting, it has uniformly met on the third second-day of the fourth month (April) in each year, at the Friends' meeting house in Arch street; and has been known as "the Philadelphia Yearly Meeting of the society of Friends."

Soon after the yearly meeting was established, the Burlington quarterly meeting was formed, and the system of ecclesiastical government of the society in England adopted here. According to this system, the meetings of the society are of two kinds; meetings for worship, and for discipline or business. They are four in number, connected together and rising in gradation as follows:—Preparative meetings, consisting of all the members of one meeting for worship; which are connected with and subordinate to a monthly meeting, consisting of several preparative meetings; which is connected with and subordinate to a quarterly meeting, consisting of several monthly meetings; and which is connected with and subordinate to the yearly meeting, which is the head of the whole society within its jurisdiction.

Besides these, there is a "meeting for sufferings," which is a subordinate department of the yearly meeting, to exercise care during the intervals between the stated sessions of that body.

The "Chesterfield preparative meeting of the society of Friends," was established at an early period, and was connected with the Chesterfield monthly meeting and Burlington quarterly meeting, which was subordinate to the Philadelphia yearly meeting held in Arch street.

In 1778 the yearly meeting reiterated a previous recommendation to the quarterly meetings, and through them to the monthly and preparative meetings, to collect funds for the establishment and support of schools under the care of committees to be appointed by the several monthly or preparative meetings. To promote this object a subscription was opened, and a number of Friends, styling themselves "members of the preparative meeting of the people called Quakers at Crosswicks," subscribed liberal sums, which they engaged to pay "to the treasurer of the

school at Crosswicks, begun and set up under the care of the preparative meeting :" declaring the purpose of these donations to be, " that the principal so subscribed is to be and remain a permanent fund, under the direction of the trustees of the said school, now or hereafter to be chosen by the said preparative meeting, and by them laid out or lent on interest, in such manner as they shall judge will best secure an interest or annuity : which interest or annuity is to be applied to the education of such children as now do or hereafter shall belong to the same preparative meeting, whose parents are or shall not be, of ability to pay for their education." The foundation of the school fund being thus laid, additions were afterwards made to it, by donations from individuals and contributions from the funds of the monthly and quarterly meetings, for the same purpose. Upon this basis the school fund was established, and as early as 1790 a school was commenced, and has since been continued, at Crosswicks.

In 1816 Joseph Hendrickson was appointed, by the Chesterfield preparative meeting of the society of Friends at Crosswicks, " treasurer of the school fund of the meeting at Crosswicks." In April, 1821, he loaned two thousand dollars of this fund to Thomas L. Shotwell, upon bond and mortgage; upon which the interest was regularly paid up to 2d April, 1827.

The society of Friends in New-Jersey and Pennsylvania had continued in unity and great harmony, under the government and control of the yearly meeting in Philadelphia, from its first establishment at Burlington, until a few years before the commencement of the present suit; when differences of religious opinions and feelings arose, which were soon disseminated through the society to a great extent, and produced a division of the society into two parties, marked by characteristic differences of opinion upon religious doctrines, since, to distinguish them, denominated the " Orthodox" and the " Hicksite" parties or portions of the society of Friends.

In 1827 the yearly meeting assembled at the stated time and place, the third second-day of fourth month, (April,) at the meeting house in Arch street. They transacted business, continued in session to the end of the week, and then regularly ad-

journed to meet again at the same place on the third second-day of the fourth month in the next year.

At this meeting, however, the divided state of the society became manifest; differences of opinion and feeling prevailed; and on the 19th, 20th and 21st days of April, and during the session of the yearly meeting, a portion of the members, dissatisfied with some of the proceedings of the yearly meeting, and especially with the appointment of clerk and of committees to visit subordinate meetings—held another meeting, of those who united with them in opinion, in Green street, at which an address to the society of Friends was agreed on and signed by order of the meeting; in which, after alluding to the divided state of the society in doctrine and feeling, and to measures of the yearly meeting deemed oppressive, they state their conviction " that the period had fully come in which they ought to look to making a quiet retreat from that scene of confusion." This meeting adjourned to meet again on the fourth day of sixth month, (June,) 1827 ; at which time they again met at the same place, and agreed upon and published a second address to the society of Friends. In this address, after alluding to the disorder and division in the society, expressing their regret at its continuance, and declaring, that to them there now appeared to be no way to regain the harmony and tranquillity of the body, but by withdrawing themselves, not from the society of Friends, nor from the exercise of its salutary discipline, but from religious community with those who had introduced and seemed disposed to continue such disorders among them." The address concludes by proposing for consideration, the propriety and expediency " of holding a yearly meeting of Friends in unity with us, residing within the limits of those quarterly meetings heretofore represented in the yearly meeting held in Philadelphia," on the third second-day of tenth month, (October,) then next.

Pursuant to this proposition, a meeting of those members of the society who united in this measure, was held, on the third second-day of tenth month, 1827, in Green street, Philadelphia; at which they formed a yearly meeting, and adjourned to meet again on the second second-day of fourth month, (April,) 1828, in Green street, Philadelphia; at which time and place a yearly

July, 1832.

Hendrickson
v.
Decow.

July, 1832.

Hendrickson
v.
Decow.

meeting of this portion of the society of Friends was accordingly held, and has since continued to be holden annually.

This division of the ancient yearly meeting of the society of Friends in Philadelphia, in April, 1827, was followed by corresponding divisions of the subordinate meetings under its control and jurisdiction ; especially of the Burlington quarterly meeting, which separated in eleventh month, 1827 : the Chesterfield monthly meeting, which in tenth month, 1827, separated into two bodies, one of which appointed delegates to attend the yearly meeting held in Green street, in Philadelphia, in that month. The separation in the Chesterfield preparative meeting at Crosswicks, took place in twelfth month, 1827, when they were divided into two distinct bodies or meetings, each of which called themselves "the Chesterfield preparative meeting of the society of Friends at Crosswicks," and claim a right to have the control and disposition of the fund for the support of the school at Crosswicks.

In first month, 1828, one of these meetings assembled to appoint trustees of the school fund, and at that meeting also appointed Stacy Decow, one of the parties to this suit, treasurer of the said fund. This meeting, by which Decow was appointed, is attached to the Chesterfield monthly meeting, and Burlington quarterly meeting, which unites with and acknowledges the Green street yearly meeting ; which they insist is the original " Philadelphia yearly meeting of the society of Friends," revived and replaced on its ancient foundations.

Joseph Hendrickson belongs to the other preparative meeting of the society of Friends at Crosswicks ; and, as they insist, still remains the treasurer of the school fund, his office being during the pleasure of the meeting, and they having taken no steps to remove him or appoint another treasurer. This preparative meeting is attached to the Chesterfield monthly meeting, and Burlington quarterly meeting, which unites with and adheres to the Philadelphia yearly meeting in Arch street, as the head of the society, which they say is the true ancient " Philadelphia yearly meeting of the society of Friends."

After this separation took place, and the appointment of Decow as treasurer, Thomas L. Shotwell, the mortgagor, refused

to acknowledge Hendrickson as the treasurer of the fund for the support of the school at Crosswicks, or to pay him the interest on the bond and mortgage. Upon this refusal, Hendrickson exhibited the bill in this case, for foreclosure of the mortgage. In his bill, after stating the origin and purpose of the school fund, his appointment as treasurer, the loaning of the money and the mortgage, he sets forth the pretension on the part of Shotwell that Stacy Decow was the lawful treasurer of the school fund, and entitled to receive the money; and for the purpose of rebutting this pretension, sets forth particularly the controversy in the society, and their division into two parties, as above mentioned. He alleges that the ground of this division was on account of religious doctrine. He charges that the following religious doctrines have always been held and maintained by the society of Friends or people commonly called Quakers :—

In the first place, although the society of Friends have seldom made use of the word Trinity, yet they believe in the Father, the Son or Word, and the Holy Spirit. That the Son was God, and became flesh. That there is one God and Father, of whom are all things. That there is one Lord Jesus Christ, by whom all things were made, who was glorified with the Father before the world began, who is God over all, blessed for ever. That there is one Holy Spirit, the promise of the Father and the Son; and leader, and sanctifier, and comforter of his people: and that these three are one, the Father, the Word, and the Spirit. That the principal difference between the people called Quakers, and other protestant trinitarian sects, in regard to the doctrine of the Trinity, is, that the latter attach the idea of individual personage to the three, as what they consider a fair logical inference from the doctrines expressly laid down in the Holy Scriptures. The people called Quakers, on the other hand, considering it a mystery beyond finite, human conception, take up the doctrine as expressly laid down in the Scripture; and have not considered themselves warranted in making deductions, however specious.

In the second place, the people called Quakers have always believed in the atonement; that the divine and human nature of Jesus Christ the Saviour, were united; that thus united he suffered; and that through his suffering, death and resurrection, he

atoned for the sins of men. That the Son of God in the fulness of time took flesh, became perfect man according to the flesh, descended and came of the seed of Abraham and David. That being with God from all eternity, being himself God, and also in time partaking of the nature of man, through him is the goodness and love of God conveyed to mankind; and that by him again man receiveth and partaketh of these mercies. That Christ took upon him the seed of Abraham, and his holy body and blood was an offering and a sacrifice for the sins of the whole world.

In the third place, the people called Quakers believe that the Scriptures are given by inspiration; and when rightly interpreted are unerring guides; and, to use the language adopted by them, they are able to make wise unto salvation through faith which is in Christ Jesus. They believe that the Spirit still operates upon the souls of men, and that when it does really and truly so operate, it furnishes the primary rule of faith. That the Scriptures proceeding from it, must be secondary in reference to this primary source, whence they proceed; but inasmuch as the dictates of the Spirit are always true and uniform, all ideas and views which any persons may entertain repugnant to the doctrines of the Scriptures, (which are unerring,) must proceed from false lights.

That such are the doctrines entertained and adopted by the ancient society of Friends; and that the same doctrines are still entertained by the Orthodox party aforesaid, to which party the complainant belongs. That these doctrines are with the said religious society fundamental; and any individuals entertaining sentiments and opinions contrary to all or any of the above mentioned doctrines, is held not to be of the same faith with the society of Friends or people called Quakers, and is treated accordingly.

The bill further charges, that the Hicksite party aforesaid, do not adopt and believe in the above mentioned doctrines, but entertain opinions entirely and absolutely repugnant and contrary thereto.

In regard to the first religious doctrine above named, the Hicksite party aforesaid believe, that Jesus Christ was a mere

July, 1832.

Hendrickson
v.
Decow.

man, divinely inspired, partaking more largely of divine inspiration than other men ; but that others, by resorting to the same means, and using the same exertions, may receive the same portion or measure of divine inspiration. That Jesus Christ, as well as the apostles and prophets, never has been and never can be set above other men. And though of late, the said Hisksite party some times ascribe divinity to Jesus Christ, yet they do it only in a figurative sense, from the circumstance of his partaking more largely than other men of divine inspiration. In every other respect they consider him a mere man. They do not believe that he partakes of the divine as well as human nature ; that he is one and the same essence with God, with that supreme and omnipotent Being who presides over and governs the universe.

In respect to the second religious doctrine above mentioned, the Hicksite party deny the doctrine of the atonement above set forth, and they contend and believe that man may have access to his God without any Mediator. They contend that the crucifixion and sufferings of Christ, if an atonement at all, were an atonement only for the legal sins of the Jews.

In respect to the third doctrine above mentioned, the Hicksite party deny the certainty and divine inspiration of the Holy Scriptures, and hold that they contain doctrines and injunctions which are incorrect; and that they are a mere shadow.

That these discrepancies in religious doctrines above mentioned, between the Hicksite and the Orthodox parties, are radical and all-important in the opinion of the complainant and his party, in reference to the principles and tenets of religion, as held by the ancient fathers of this religious society. The Orthodox party, believing, as they firmly do, that the doctrines entertained by the Hicksite party, strike at the foundation and main pillars of the Christian religion ; that in consequence of these differences in doctrine, the Hicksite party are not in the same faith with them, and the ancient religious society of Friends.

The bill then charges, that during the yearly meeting of the Society of Friends in Philadelphia, which commenced on the third second-day of April, 1827, the Hicksite party held several private irregular meetings of their own party, which no other

74

members of the society attended, or were invited to attend; at which they agreed on and published an address to the society. That they again met in sixth month, (June,) and published another address, among other things proposing for consideration the propriety of holding a yearly meeting of Friends in unity with themselves, and recommending another meeting to be held in Philadelphia on the third second-day in October then next. That in pursuance of this recommendation they met in Philadelphia in October, 1827, and then and there, contrary to the discipline, constitution and government of the society of Friends, formed a new yearly meeting of their own party : which was adjourned to the second Monday in April, 1828. That on that day they met, and held their new yearly meeting in Green street, Philadelphia.

That on the third Monday in April, 1827, pursuant to adjournment from the preceding year, the Orthodox party held the ancient yearly meeting of the society of Friends, in Arch street ; which still continues to be holden by them on the third Monday in April annually ; which they say is the ancient "Philadelphia yearly meeting of the society of Friends," and which is recognized by the ancient yearly meeting in London as a regular yearly meeting of the society of Friends, and is in correspondence and fellowship with them : whereas the new yearly meeting of the Hicksite party is not recognized by the yearly meeting of London, and holds no correspondence with them. That the Hicksite and Orthodox parties are thus completely divided, and no longer form two parties of the same society, but two distinct religious communities. That the Hicksite party have seceded, not only from the faith, but from the religious institutions and government of the society of Friends.

The bill likewise charges, that these religious dissensions and divisions exist in the Burlington quarterly, and the monthly and preparative meetings at Crosswicks. That the Hicksite party and the Orthodox party there hold separate meetings for business and worship; the former being under the jurisdiction of the new yearly meeting held in Green street, and the latter under the jurisdiction of the ancient Philadelphia yearly meeting held in Arch street ; which does not recognize the preparative meeting at

July, 1832.

Hendrickson
v.
Decow.

Crosswicks held by the Hicksite party, by which Stacy Decow was appointed treasurer.

Upon the filing of this bill, Thomas L. Shotwell, the defendant, exhibited a bill of interpleader against Hendrickson and Decow, the two adverse treasurers of the school fund; in which he sets forth the claims and pretensions of both the said parties, respectively; and that by reason of these conflicting claims he is in danger of being greatly harassed on account of his said bond and mortgage; which he offers to pay, on being indemnified by the decree of the court.

To this bill Hendrickson filed an answer, in which he reiterates and insists on the various grounds charged in his original bill.

Decow, in his answer, admits the origin, establishment and purpose of the school fund, as above set forth. That the Chesterfield preparative meeting of the society of Friends at Crosswicks, have a right to appoint trustees of the said school fund, and are entitled to the control, use and disposition thereof. That the meeting also appoints the treasurer, who holds his office during the pleasure of the meeting. He admits that, in 1816, Joseph Hendrickson was appointed by the said meeting, treasurer of the said school fund; and that he made the loan to Shotwell upon bond and mortgage: admits the filing of the original bill and bill of interpleader, as above stated, but says he denies many of the charges contained in the original bill.

He alleges, among other things, that the preparative meeting of the society of Friends at Crosswicks; which comprised at least two-thirds of the original subscribers and contributors to the said school fund and their lawful representatives, and were a lawful majority of the regular and lawful members of the Chesterfield preparative meeting of the society of Friends or people called Quakers at Crosswicks, and had the lawful right to appoint the treasurer and trustees of the said school fund, and right to the care, use and disposition thereof; on the 31st day of first month, 1828, appointed him (Decow) treasurer of the said school fund, and successor of the said Joseph Hendrickson, and that he now is the treasurer, and entitled to the money due on said bond and mortgage.

He says, that the religious society of Friends are a well known denomination of Christian professors, who became associated under that name in England about the middle of the seventeenth century.   That they early adopted a system of discipline, which has continued in use ever since: the rules and regulations of which relate, partly to the preservation of a decent and comely order in its internal polity—partly to the observance of the principles of morality and justice by all belonging to it—and partly to the maintenance of its peculiar testimonies ; which rules are subject to alteration, modification and revision by the society, and have been revised, altered and modified, from time to time, as circumstances appeared to require.   That the said society, in reference to its members, is a pure democracy ; all its members having equal rights ; neither ministers, elders, clerks or other officers having any pre-eminence over their brethren, in right, authority, rank or privilege.   That the society in England have a yearly meeting, and the society in this country have yearly meetings, but the said yearly meetings are wholly independent of each other, as well in their establishment, as in their government and authority.

He admits the introduction of the society into this country, and the establishment of the preparative, monthly, quarterly and yearly meetings, as stated ; and says that the executive power, as relates to discipline, is lodged in the several monthly meetings.   That the quarterly meetings are merely a larger meeting of the members of the monthly meetings, and established by them ; and the yearly meetings are only a larger meeting of the members of the same monthly meetings ; which are represented through their different quarters, by members therein appointed, merely as organs of communication, that all parts of the society may be represented, but not placing in their hands any control over their brethren : the power remaining in the brethren at large, the great democratic body ; to whom only the name, title and authority of the yearly meeting belong.

That the superior power resides in the individual members of the several meetings ; therefore the monthly meeting, being established by mutual consent and agreement of the members of the society, delegating to it certain powers ; and the quarterly

and yearly meetings each having their powers and duties delegated, which are defined and regulated by the rules contained in a book of discipline, can have no other or greater rights or powers than those therein granted to them: what is not thus granted remains with the individual members of the society, the original possessors of the whole power.

That in the yearly meeting, such regulations as from time to time appear expedient, and tend to the good of the whole society, are proposed and agreed on, and comprehended in a book of discipline; and all questions are resulted by the verbal or silent acquiescence of the members collected, and not by any order of members as having a rank or authority in the meeting above others. If any new proposition be made, which does not accord with the views of the members generally, it is suspended, or dismissed. It does not of right review the proceedings of the subordinate meetings, except in the single case of an appeal, made by a member considering himself aggrieved by a monthly meeting in disowning him; and recourse to it is seldom had from the subordinate meetings, except for advice, in cases of uncommon difficulty arising in monthly or quarterly meetings. And all questions and matters submitted to a preparative, monthly, quarterly or other meeting of the society of Friends, in relation to the religious or temporal affairs of the society, are determined by the voice or consent of the *majority* present, ascertained either by their expressed assent or silent acquiescence.

That the said society of Friends hath been preserved in a great degree of harmony until lately, when a few individuals, who had long been continued in important stations, began to assume an authority over their brethren, never delegated to them; and attempted to impose upon the yearly meeting, a document in a form designed to operate as a *written creed*, adapted to their own particular views, and subversive of that freedom of thought and individual opinion which the society of Friends had always cherished and maintained as an unalienable right. That such document was promptly rejected by the yearly meeting; and it soon became manifest that a party was formed, assuming the character and title of the *Orthodox ;* and a line of discrimination was attempted to be drawn through the different meetings, in

order to fill every active station with those under their particular influence, or actuated by a common object. Approved ministers were publicly opposed; and faithful members, who bore a testimony against their systematical declension from the principles and practice of the society, were actually proscribed, and publicly disowned.

These efforts to monopolize a power before unknown to the society, subversive of equal rights, introducing disorder and confusion, and preventing the orderly course of business in the monthly and quarterly meetings, were continued until the yearly meeting in fourth month, 1827, when a clerk was forced upon the said meeting by the Orthodox party, in decided opposition to the voice of a large majority of the representatives, and openly declared judgment of a large body of Friends, expressed at the time. By this and other party acts, they broke the compact which had long bound the meeting together as a band of brethren ; and the business that was done at that meeting was mainly the acts of that party, and not of the whole body. More especially, after having agreed in the opinion that the yearly meeting was not then in a situation to consider and act upon divers important subjects, contained in reports from quarterly meetings ; the said Orthodox party did, at the last sitting of the said meeting, appoint a large committee of their own party exclusively, to go down to the inferior meetings to take care of their own members ; although the appointment of a committee was strongly opposed at the time, by a large number of Friends, and a majority of the meeting.

At this last sitting of the meeting, after Friends had fully ascertained that all their endeavors to have the business done as the acts of the meeting, not as those of the said party, were unavailing ; and having been deprived from participating in the business ; they ceased their further endeavors to participate therein : and the adjournment which took place was the exclusive act of the Orthodox party, and not of the body of the society of Friends, and therefore not binding upon the meeting. And inasmuch as the larger part of the members of the said yearly meeting, could not conscienciously consent to meet again, in the same capacity, with the said Orthodox party ; and there being no con-

stitutional time for the assembling of the yearly meeting; the time of holding it was changed to the time it is now held, to wit, on the *second* second-day of fourth month ; which the society of Friends might lawfully do, without forfeiting their rights by a mere variation in the time and place of meeting ; which is legitimately subject to their control and appointment.

The subsequent course pursued by Friends, was the act of the main body, in the exercise of the original powers vested in them, in order to the attainment of that peace and harmony for which they had so long been distinguished. In pursuing which, the said yearly meeting assembled again on the second second-day of fourth month, 1828, and is now settled on its ancient foundations and principles, comprising full three-fourths of the whole body of its former members ; who are united in the same system of discipline, maintaining the same testimonies, and holding the same religious faith as their forefathers, the ancient society of Friends. In which meeting, all the quarterly meetings previously composing it, are now represented. The defendant denies, therefore, that it is a new yearly meeting within the pale of one already in existence.

The defendant farther says, the society of Friends acknowledge no head but Christ, and no principle of authority or government in the church, but the love and power of God operating on the heart, and thence influencing the judgment, and producing a unity of feeling, brotherly sympathy and condescension to each other. That the great fundamental principle of the society—*the Divine light and power operating on the soul*—being acknowledged by all its members, as the effective bond of union ; the right of each individual, to judge of the true meaning of scripture testimony relative to the doctrines of Christianity, according to the best evidence in his own mind, uncontrolled by the arbitrary dictation of his equally fallible fellow man; hath been tacitly, as well as explicitly, acknowledged by the society.

The defendant avers and insists, that the said Chesterfield preparative meeting of Friends at Crosswicks, to which he belongs, is the same meeting under whose care the school fund was placed by the contributors thereto, and are identified with

them in due and regular succession; and are a part of the ancient society of Friends. That *they believe in the Christian religion*, as *contained in the New Testament*, and as professed by the ancient Friends, and adhere to the religious institutions and government of the society of Friends, and bear the same cardinal testimonies to the whole world as are held most important and characteristic in the said society; among which are, a testimony against war—a hireling ministry—against taking oaths—against going to law with brethren—and a concern to observe the golden rule, " do unto all men as we would they should do unto us." And that the persons under whom the said Joseph Hendrickson claims, are a minority of the said preparative meeting, and as individuals and collectively, have voluntarily withdrawn themselves, and seceded from said meeting, and have no longer any communion therewith.

The defendant admits there has been a controversy in the society of Friends, which has divided them: the minority assuming the name of the *Orthodox* party, and bestowing upon the majority of their brethren, from whom they have seceded, the name of *Hicksite*, a name never assumed or acquiesced in by a majority of the said society, to which the defendant belongs, and which name they deny, but claim that of Friends. And they deny being the followers of any man, or set of men; simply claiming to be the humble disciples and followers of Christ, the great head of the church: and insist, that they constitute the great body of *the society of Friends*, which name they still adhere to; and allege that they still hold, and are endeavoring to maintain and support, the doctrines, fundamental religious principles, discipline and rules of government of the ancient religious society of Friends or people called Quakers. And he denies that he the defendant, and his associates, have seceded from the faith, or from the religious institutions and government of the society of Friends, and the ancient yearly meeting in Philadelphia. And the defendant insists, that by the law and constitution of New-Jersey, the *rights of property* are sacred and inviolate, and cannot be taken from an individual without his or their consent; and more especially that it cannot be made to depend on the test of any *religious creed*, framed after its

vesting, and artfully prepared by a minority to answer its purposes.

July, 1832.

Hendrickson
v.
Decow.

The defendant admits, that the Chesterfield preparative meeting of Friends at Crosswicks, of which he is a member, holds communication with the yearly meeting of Friends established in Philadelphia, which the complainant in his original bill improperly calls the Hicksite party; which yearly meeting, the defendant insists, is the yearly meeting of the ancient and true society of Friends. The defendant also insists, that the question and facts introduced into the original bill, in relation to the schism in the society of Friends, and discrepancies among them in regard to matters of faith and discipline; if they exist, (which he does not admit,) and also in respect to the separation of the yearly meetings; cannot lawfully or equitably affect the right to the fund belonging to the said Chesterfield preparative meeting of Friends at Crosswicks: and submits, that the only legitimate inquiry before the court, respects the *right of property* to the bond and mortgage, and money due thereon, mentioned in the bill; and that neither this nor any other court, have a right to institute *an inquest into the consciences or faith of members of religious societies* or associations, or subject them to the ordeal of a creed, prepared by those claiming adversely, in order to disfranchise or deprive them of their property and legal right; and protests against the existence and exercise of such a power.

And the defendant says, that there may have been cases in which the yearly meeting in England took advisory cognizance of cases of appeal from the yearly meeting in Philadelphia; but they were cases of consent, and have long since ceased; and were contrary to the fundamental principles of the said yearly meetings in this country, which were independent of any other meetings, and so continue. And although it may be true, that the yearly meeting in London refuses to correspond with the Philadelphia yearly meeting to which the defendant belongs, it can have no effect on the rights of the members of the said yearly meeting in Philadelphia, which professes to be the true and ancient yearly meeting of the society of Friends.

After the filing of these answers, witnesses were examined on both sides, depositions taken, and exhibits made, which together

75

with the pleadings at large, will be found in "Foster's Report" of the testimony in this case, in two vols. 8vo., published in Philadelphia, 1831.

The chancellor while at the bar having been of counsel in the cause, agreeably to the practice of the court, called to his assistance on the hearing, EWING, chief justice, and DRAKE, associate justice of the supreme court, before whom the cause was argued, by

*G. Wood* and *I. H. Williamson,* for Hendrickson, the complainant in the original bill; and

*G. D. Wall* and *S. L. Southard,* for Shotwell, the defendant in the original bill, and complainant in the bill of interpleader; and Decow, the defendant.

The counsel, in their arguments, insisted on, and endeavored to sustain and prove from the evidence in the cause, the claims and pretensions of the respective parties, as set forth in the pleadings.

At the present term, the following opinions were delivered:—

EWING, Chief Justice.   Joseph Hendrickson exhibited a bill of complaint in this court, stating that on the second day of April, one thousand eight hundred and twenty-one, being the treasurer of the school fund of the preparative meeting of the society of Friends of Chesterfield, in the county of Burlington, he loaned the sum of two thousand dollars, part of that fund, to Thomas L. Shotwell, who thereupon made a bond to him, by the name and description of Joseph Hendrickson, treasurer of the school fund of Crosswicks meeting, conditioned for the payment of the said sum, with interest, to him, treasurer as aforesaid, or his successor, on the second day of April, then next ensuing, and also a mortgage of the same date, by the like name and description, on certain real estate, with a condition of redemption, on payment of the said sum of money, with interest, to the said Joseph Hendrickson, or his successor, treasurer of the school fund, according to the condition of the aforesaid bond.   He farther states, that Thomas L. Shotwell re-

fuses to pay the money to him, being treasurer as aforesaid, on divers unfounded and erroneous pretensions; and he seeks relief in this court by a decree for the foreclosure of the mortgage, or for a sale of the mortgaged premises, and an appropriation of the proceeds to the payment of the debt.

July, 1832.

Hendrickson
v.
Decow.

Sometime after the exhibition of this bill, Thomas L. Shotwell filed here a bill of interpleader, wherein Joseph Hendrickson and Stacy Decow are made defendants; in which he admits the above mentioned bond and mortgage, and the source from which emanated the money thereby intended to be secured, the school fund of the Chesterfield preparative meeting. He admits, also, the liability of himself and the real estate described in the mortgage, and avows his readiness and willingness to pay whatever is due. But he says Stacy Decow has warned him not to pay to Joseph Hendrickson, alleging that Hendrickson is no longer treasurer of the fund, and has therefore no right to receive; and that he is the treasurer and successor of Hendrickson, and as such claims the money mentioned in the bond and mortgage. Seeking, then, the protection of this court, and offering, on being indemnified by its power, to pay to whomsoever the right belongs, he prays that Joseph Hendrickson and Stacy Decow may, according to the course and practice of this court, interplead, and adjust between themselves their respective claims.

Joseph Hendrickson answered this bill; and insists, as in his original bill, that he is, as he was when the bond and mortgage were executed, the treasurer of the school fund of the Chesterfield preparative meeting of Friends at Crosswicks, and is entitled to the bond and mortgage, and to receive the money due thereon.

Stacy Decow has also answered the bill of interpleader. He admits the loan of the money, part of the school fund, to Shotwell, and the due execution and delivery, and the validity of the bond and mortgage, and that when they were made, Joseph Hendrickson was the treasurer of the school fund, duly appointed by the Chesterfield preparative meeting at Crosswicks; in whom, as all the parties in this cause admit, was vested the right of appointing the treasurer of the fund. But he says, that before the filing of the original bill by Joseph Hendrickson, and "on the

thirty-first day of the first month, 1828, at a lawful meeting of the said Chesterfield preparative meeting of Friends, held at the usual time and place of meeting at Crosswicks, he was appointed, in due and lawful manner, treasurer of the said school fund, to succeed the said Joseph Hendrickson; and as such successor, became entitled to all the books, obligations and other papers, which he had in his possession, and also to the funds then in his hands, and more particularly to the bond and mortgage in the original bill and bill of interpleader mentioned, and the money due thereon; and the said Joseph Hendrickson ceased to have any right, title or claim thereto." He farther insists, "that he always has continued since his appointment, and is the lawful treasurer of the said school fund, and as the successor of the said Joseph Hendrickson is lawfully entitled to have and receive all such bonds, obligations and mortgages, and the money due thereon, as had been taken for the loan of any part of the said fund in his name as treasurer of the said school fund, or payable to him, as such treasurer, or his successor."

This brief view of the pleadings is here presented, in order distinctly to exhibit, in a clear and naked manner, divested of auxiliary and explanatory matters, and especially of forensic forms, the grounds of the respective claims of the interpleading parties. And hence, we may discern, the great outlines of the enquiries which an investigation of this cause will lead us to make. For according to these pretensions, and to these alone, thus set forth in the pleadings, as they are respectively supported or subdued by the proofs, the decree of this tribunal must be made, whatever other points favorable or unfavorable to either party may become manifest by the evidence.

Joseph Hendrickson claims the money, because originally made payable to him, and because he is, as he then was, the treasurer of the fund.

Stacy Decow claims the money, because payable by the terms of the bond to the successor of Joseph Hendrickson in that office, and because he became, and is such successor, and the present treasurer.

A slight sketch of the history of the establishment and organization of the Crosswicks school, and of the fund, may be inter-

esting, and will, perhaps, shed light on some step in the progress of our investigations.

The education of youth and the establishment of schools, attracted the care and attention, and brought out the exertions, of the yearly meeting of Philadelphia, at an early day. Most earnest and pressing recommendations of these interesting duties, to the consideration and notice of the society, were repeatedly made; and to render these more effectual, committees were appointed to attend and assist the quarterly meetings. In the year 1778, the yearly meeting adopted the report of a committee, "that it be recommended to the quarterly, and from them to the monthly and preparative meetings, that the former advice, for the collecting a fund for the establishment and support of schools, under the care of a standing committee, appointed by the several monthly or particular meetings, should generally take place, and that it be recommended by the yearly meeting, to Friends of each quarter, to send up the next year, an account of what they have done herein." And the report suggests the propriety of "a subscription towards a fund, the increase of which might be employed in paying the master's salary, and promoting the education of the poorer Friends' children:" 2 *vol. Evid.* 387.

The quarterly meeting of Burlington appear to have faithfully striven to promote the wise views and benevolent purposes of the yearly meeting. In 1777, and 1778, appropriate measures were adopted: 2 *vol. Evid.* 436. In 1783, the subject was "afresh recommended to the due attention of their monthly and preparative meetings, and to produce renewed exertion," a committee previously appointed, was discharged, and a new one raised; and "it is desired," says the minute, "that accounts of our progress herein, may be brought forward timely, to go from this to the ensuing yearly meeting:" 2 *vol. Evid.* 436.

Within the bounds of the Chesterfield monthly meeting, although a committee had been for some time charged with the subject, there appears no practical result, until after the meeting in April, 1788, when a new committee was appointed, "to endeavor to promote the establishing of schools, agreeably to the directions of the yearly meeting:" 2 *vol. Evid.* 349. In August, 1789, the committee reported, that they had agreed on a place

July, 1832.

Hendrickson
v.
Decow.

to build a school-house, and had obtained subscriptions to a considerable amount, and had agreed to lay the same before the monthly meeting for their approbation." The minute of the meeting approves, " and empowers them to proceed :" 2 *vol. Evid.* 349. To the monthly meeting of August, 1791, " the committee appointed for the establishment of schools, agreeably to the direction of the yearly meeting, reported, there is a house at Chesterfield, so far finished, that a school might be kept in it, but it is not yet occupied for that purpose ; neither is there any such school within this monthly meeting." The clerk was directed " to send up" this report " to the ensuing quarterly meeting :" 2 *vol. Evid.* 349. No other action on it took place by the monthly meeting, until December, 1791, when they recommended to the preparative meeting in Chesterfield, " and they are hereby authorized," says the entry on the minutes, " to open a school in the said house, and appoint a suitable number of Friends, as trustees, to take the care and oversight thereof, and to make rules and regulations for the government and promotion of the institution ; which rules and regulations shall always be inspected by the monthly meeting committee, for their approbation or disallowance ; and said meeting are likewise authorized to appoint a treasurer, to receive subscriptions and donations for accumulating a fund :" 2 *vol. Evid.* 349, *exhib.* 51.

The fruit of these discreet and vigorous measures soon appeared. The house built, provision made for trustees and a treasurer, and the accumulation of a fund thus earnestly resolved, a subscription was opened, and numerous and generous donations were obtained. The original instrument of writing has been produced before us. It is an interesting record of liberality. The subscribers describe themselves to be " members of the preparative meeting of the people called Quakers, at Crosswicks." They engage to make the payments to the " treasurer of the school at Crosswicks, begun and set up under the care of the preparative meeting." And the purpose is thus declared :—" The principal whereof, so subscribed, is to be and remain a permanent fund, under the direction of the trustees of the said school, now or hereafter to be chosen by the said preparative meeting, and by them laid out or lent on interest, in such manner as they shall

judge will best secure an interest or annuity, which interest or annuity is to be applied to the education of such children as now do, or hereafter shall, belong to the same preparative meeting, whose parents are, or shall not be, of ability to pay for their education :" *Exhib.* 1, 2 *vol. Evid.* 411.

July, 1832.

Hendrickson
v.
Decow.

This subscription was the basis of the school fund. Accessions to it were afterwards made, by other individuals of the society ; and the quarterly meeting of Burlington, who held and owned a stock, composed of donations, bequests, and the proceeds of the sale of some meeting-houses, resolved, in 1792, to divide a portion of it among the monthly meetings, " for the promotion of schools, answerable to the recommendation of the yearly meeting, by establishing permanent funds within such of the meetings where none have been heretofore, or in addition to such as are already established :" 2 *vol. Evid.* 437, *exhib.* 32. The share of Chesterfield monthly meeting having been received, was subdivided, and a part of it paid over to the treasurer of the school fund of the preparative meeting of Chesterfield, " to be applied to the use directed by the minute of the quarterly meeting :" 2 *vol. Evid.* 347, *exhib.* 51. In 1802, a farther sum, arising from the sale of " an old meeting-house," was paid to the treasurer, by the monthly meeting, to be appropriated in the same manner : *Exhib. O* 2, 2 *vol. Evid.* 347.

In this way, and by discreet and prudent management, a fund was accumulated, a school-house erected, and, as we learn from one of the witnesses, " Friends, for many years, generally had a school kept therein, under their superintendence, and frequently appropriated a part of the proceeds towards paying the teacher's salary, and for the education of children contemplated in the original establishment of the fund :" *Samuel Craft,* 2 *vol. Evid.* 350.

A part of this fund, as we have already seen, was loaned to Thomas L. Shotwell, and is the subject of the present controversy.

For the direction of the school, and for the care, preservation, and management of the fund, provision, as has been shewn, was made, as well by the terms of the subscription, as by the resolution of the monthly meeting. The officers, were accordingly ap-

July, 1832.

Hendrickson
v.
Decow.

pointed by the preparative meeting, from time to time, as occasion required. The trustees were usually chosen in the first month of every year : 2 *vol. Evid.* 287. No fixed term of office appears to have been assigned to the treasurer ; so that the incumbent remained until removed by death, resignation, or the will of the appointing body. The person who held that station when the subscription was made, continued there until 1812, when another Friend succeeded him, and remained in office until Joseph Hendrickson was duly appointed, in 1816.

The facts thus far presented are not, and from the pleadings and evidence in the cause, cannot be, the subject of dispute. There are some positions, deducible from them, which are equally clear and incontrovertible.

*First.* The money mentioned in the bond being payable to Joseph Hendrickson, as treasurer, he has an indisputable right to claim and receive it, if he remains in that office.

*Second.* Inasmuch as he was duly appointed, which is unequivocally admitted by the pleadings, and inasmuch as the term of office of treasurer does not cease by efflux of time or by previous limitation, the legal presumption is that he remains in office until competent evidence of his due removal is given.

*Third.* Such being the case, Joseph Hendrickson is not required to produce farther evidence of his right to receive the money, or of his continuance in office, or that he has been retained there by the competent authority ; but whoever denies that right, or seeks to sustain any claim on the ground that he has ceased to be treasurer, ought to establish the ground by lawful and sufficient proof.

*Fourth.* Inasmuch as Stacy Decow alleges that Joseph Hendrickson was removed from office, and that he was appointed his successor and treasurer of the school fund, (and upon this removal and appointment, he rests, in his answer, for the entire support of his claim,) it is incumbent on him to establish the fact and legality of this removal and appointment.

The power of appointment and removal, as the litigating parties unqualifiedly admit, is vested in the Chesterfield preparative meeting at Crosswicks, meant and mentioned in the original subscription paper or agreement of the donors ; which is distinguish-

ed as Exhibit No. 1, and which I have already referred to as the basis of the school fund. The parties also admit, or rather, insist, in their pleadings, by their evidence, and in the arguments of their counsel, that the preparative meeting is one and undivided; or in other words, that there is and can be but one body entitled to be called the Chesterfield preparative meeting, to exercise its power and authority, and especially the prerogative of removal and appointment. It farther appears from the evidence, that a body calling themselves, and claiming to be, the Chesterfield preparative meeting of Friends at Crosswicks, did, on the 31st day of January, 1828, adopt a resolution and enter it on their minutes, to the following effect: " This meeting being now informed by the trustees who have the immediate care and trust of the school fund belonging to this meeting, that the person who was sometime since appointed treasurer thereof, refuses to settle the account of the said fund with them, this meeting, therefore, now think it best to appoint a Friend to succeed him as treasurer of the said fund, and Stacy Decow being now named to that service and united with by this meeting, is appointed accordingly."

We are now brought to the issue between these parties, and are enabled to propound for solution, the question on which their respective claims depend; was this body the Chesterfield preparative meeting of Friends at Crosswicks, meant and mentioned in the establishment of the school fund? If it was, Stacy Decow is the successor and treasurer. If not, Joseph Hendrickson remains in office, and is entitled to the money.

The meetings in the society of Friends are of two kinds; for worship, and for discipline, as they are sometimes called, or in other words, for business. This distinction is sufficiently correct and precise for our present purposes, and it is not necessary to pause to consider of the suggestion, I have read somewhere in the testimony or documents in the cause, or perhaps, heard from the counsel in argument, that every meeting for discipline, is in truth a meeting for worship, since he who cordially and faithfully performs any ecclesiastical duty, does thereby pay an act of adoration to the Almighty.

The meetings for business are four in number, marked and dis-

76

tinguished by peculiar and characteristic differences; prepara-
tive, monthly, quarterly and yearly. These are connected to-
gether, and rise in gradation and rank in the order of their enu-
meration. Each yearly meeting comprehends several quarterly
meetings; each quarterly meeting several monthly meetings;
and every monthly meeting embraces several of the lowest order,
preparative meetings. The preparative meeting is connected
with, and subordinate to, some monthly meeting; the monthly
meeting, to some quarterly meeting; the quarterly meeting, to
its appropriate yearly meeting. The connection and subordina-
tion are constitutional and indispensable: insomuch, that if any
quarterly meeting withdraws itself from its proper yearly meet-
ing, without being in due and regular manner united to some
other yearly meeting, it ceases to be a quarterly meeting of the
society of Friends. In like manner of the other meetings, down
to the lowest. So that if a preparative meeting withdraws from
its peculiar monthly meeting, and does not unite with another of
the same common head, or some other legal and constitutional
head, or in other words, some acknowledged meeting, it does,
from the moment, and by the very act of withdrawal, cease to be
a preparative meeting of the society of Friends.

The truth of the position I have thus laid down, respecting
connection and subordination, will not, I presume, in the man-
ner and to the full extent which I have stated, meet with any
denial or doubt. Yet, as it is of considerable importance in the
present cause, I shall show that it is established; first, by the
constitution or discipline of the society; second, by their usages,
or as they might be called, in forensic language, cases in point,
or precedents; and lastly, by the opinion of the society at large,
so far as may be learned from the views of well-informed mem-
bers.

In the first place, then, as proposed, let us look into the book
of discipline. We find there the following clear and explicit
language. "For the more regular and effectual support of this
order of the society, besides the usual meetings for the purposes
of divine worship, others are instituted, subordinate to each oth-
er; such as, first, preparative meetings, which commonly con-
sist of the members of a meeting for worship; second, monthly

meetings, each of which commonly consists of several prepara-
tive meetings; third, quarterly meetings, each of which consists
of several of the monthly meetings; and fourth, the yearly meet-
ing, which comprises the whole." "These meetings have all
distinct allotments of service." The connection of the several
meetings, and their subordination, in the manner I have sug-
gested, are here most plainly and unequivocally shown and es-
tablished. The place which this clause occupies in the discipline
or constitution, (and the latter name seems more familiar, or at
least to convey to professional minds, more distinct ideas,) serves
to illustrate its importance. It is mentioned at the commence-
ment; as if, one of the first truths to be taught and known; as
if, the very foundation of the structure of discipline raised upon
it. The article on appeals speaks the same idea. A person ag-
grieved may appeal from the monthly meeting to the quarterly
meeting, and the monthly meeting are, in such case, to appoint
a committee to show the reasons of their judgment and submit
it there, where the judgment is to be confirmed or reversed.
From the quarterly meeting, an appeal may be taken to the
yearly meeting, where a committee are to attend with copies of
the records of the monthly and quarterly meetings, and where
the matter is to be finally determined; and a copy of the deter-
mination is to be sent to the meeting from which the appeal
came. In the article on meetings for discipline, are contain-
ed the following clauses:—"The connection and subordination
of our meetings for discipline are thus; preparative meetings are
accountable to the monthly; monthly to the quarterly; and the
quarterly to the yearly meeting. So that if the yearly meeting
be at any time dissatisfied with the proceedings of any inferior
meeting, or a quarterly meeting with the proceedings of either
of its monthly meetings, or a monthly meeting with the proceed-
ings of either of its preparative meetings, such meeting or meet-
ings ought, with readiness and meekness, to render an account
thereof when required." "It is agreed, that no quarterly meet-
ing be set up or laid down without the consent of the yearly
meeting; no monthly meeting without the consent of the quar-
terly meeting; nor any preparative or other meeting for business
or worship, till application to the monthly meeting is first made,

and when there approved, the consent of the quarterly meeting be also obtained."

Another clause requires monthly meetings to appoint representatives to attend the quarterly meetings ; and that at least four of each sex be appointed in every quarterly meeting to attend the yearly meeting. Another clause is in these words : "The use and design of preparative meetings is, in general, to digest and prepare business, as occasion may require, which may be proper to be laid before the monthly meeting."

The connection and subordination of these meetings, and their relative rank or station in ecclesiastical order, being thus plainly and conclusively shown and established by the highest authority, the revered and respected rule of government for this whole religious community, we may naturally expect, what accordingly we find, numerous instances of the exercise of authority, of the subsistence of this connection, and of the fruits of this subordination, in the conduct toward each other, of the respective meetings. From the examples which are abundantly furnished us in the evidence, I shall select a very few, and I prefer, for obvious reasons, to take them from the minutes of Burlington and Chesterfield meetings. The constant intercourse by representatives, and the frequent appointment and attendance of committees from the yearly to the quarterly, and from the latter to inferior meetings, need only to be mentioned in general terms, to be brought fresh to the remembrance of all who know any thing of the ecclesiastical history of their own times or of their predecessors, or who have perused the testimony and documents before us. In second month, 1778, the quarterly meeting of Burlington directed the times of holding certain preparative meetings, so as to be convenient to a committee who were to visit them. In second month, 1820, the quarterly meeting refused to allow the holding of an afternoon meeting for worship, in Trenton, and directed their clerk to inform the monthly meeting of Chesterfield of their determination. In 1821, the Trenton preparative meeting requested of the monthly meeting, permission to continue their afternoon sittings, and leave for one year was given. In fifth month, 1825, the quarterly meeting declared, that certain persons admitted into membership in Chesterfield monthly meet-

ing, were not members, and the clerk was directed to communicate this conclusion to that meeting and to the individuals. In fifth month, 1825, the quarterly meeting *annulled* the proceedings of the Chesterfield monthly meeting respecting the reception of a person as one of its members. In eleventh month, 1825, Trenton afternoon meetings were discontinued by order of the monthly meeting. In fourth month, 1826, the Trenton preparative meeting requested permission to hold an afternoon sitting, which, at the next monthly meeting, was refused. In 1826, Thomas L. Shotwell, one of the parties in this cause, was disowned by the monthly meeting of Chesterfield. He appealed to the quarterly meeting of Burlington, where the disownment was confirmed. In the Chesterfield preparative meeting of sixth month, 1827, the extracts from the yearly meeting of fourth month, 1827, were produced and read. Contributions of money are statedly made, according to a prescribed ratio, and forwarded by the inferior to the superior meetings, and thus a stock, as it is called, is maintained in the yearly meeting. Occasional, or *ex re nata*, contributions have also, at times, been made. The yearly meeting of 1827, recommended the raising of a large sum, three thousand dollars, for a work of benevolence, and the preparative and monthly meetings of Chesterfield pursued the recommendation, and bore their usual and proportional part in carrying it into effect.

A brief reference will show that individuals, as well as meetings and the book of discipline, recognize and maintain the connection and subordination of the several bodies in the society. In the pleadings of the parties in this cause, the position is stated by each of them, especially by the interpleading parties, Hendrickson and Decow. To these documents, as far as the cause is concerned, it might suffice to refer, since whatever is admitted by both parties, is, as respects them, incontrovertible. But a recurrence to the following parts of the testimony, will show that what is said on this topic in the pleadings, is the very language and sentiment of this whole religious community. For the sake of brevity, I will content myself with mentioning the names of the witnesses, and the pages of the printed volumes, whither any one will resort who is disposed to examine them at

large. *Samuel Bettle*, 1 vol. 62, 63, 83; *Samuel Parsons*, 1 vol. 170; *Thomas Evans*, 1 vol. 271, 272, 311; *John Gummere*, 1 vol. 316; *Samuel Craft*, 1 vol. 334; *Abraham Lower*, 1 vol. 379, 405; *Halliday Jackson*, 2 vol. 144, 178, 191; *Charles Stokes*, 2 vol. 218, 229; *Josiah Gaskill*, 2 vol. 297; *James Brown*, 2 vol. 321, 322.

From this view, it seems to me, established beyond the reach of doubt, that according to the constitution of the society of Friends, a preparative meeting must be subordinate to and connected with a monthly meeting, which is connected with and subordinate to a quarterly meeting, which again is connected with and subordinate to a yearly meeting. There can be no preparative meeting which is not so connected and subordinate. To descend from generals to particulars, every preparative meeting within the bounds of the yearly meeting of Philadelphia, is, and must be, connected with, and subordinate to, a monthly meeting connected with, and subordinate to, a quarterly meeting, which is connected with and subordinate to, that yearly meeting. There can be no preparative meeting within those bounds, which is not so connected and subordinate. From this constitutional principle, the following rule results as a corollary. Every preparative meeting within those bounds, which is, through and by its appropriate links, connected with, and subordinate to, the yearly meeting of Philadelphia, is a "preparative meeting of the people called Quakers;" and any preparative meeting or assemblage of persons calling themselves a preparative meeting, not thus connected and subordinate, is not a preparative meeting of that people.

In laying down these propositions, I expressly avoid, and do not propose to examine or decide, unless in the sequel I find it necessary, a question much agitated and discussed, whether a preparative meeting can be laid down without its consent. There is, however, another proposition connected therewith, which, so as to make use of it hereafter, if necessary, I shall state barely, without a protracted or tedious inquiry, because I believe no one will gainsay it. A preparative meeting, cannot be made or constituted within the bounds of its superior, the quarterly; or to speak more definitely, a new preparative meeting

cannot be set up, within the bounds of the Burlington quarterly meeting, without the sanction of the latter body ; that is to say, of the Burlington quarterly meeting, which is connected with, and subordinate to, the yearly meeting of Philadelphia. I avoid, for the present at least, another topic, or rather, I mean, in the propositions above stated, to express no opinion upon it, whether a superior meeting may control an inferior, in matters of property, or of a pecuniary nature ; and also, another topic somewhat discussed in the examination of the witnesses, if not by the counsel on the argument, whether a superior meeting can, without appeal, reverse the decision of an inferior, or take cognizance directly and originally, of matters not coming, by way of appeal, through the subordinate meetings.

The general doctrine of the connection and subordination of meetings for business, I shall now proceed to show, has been expressly applied to the preparative meeting of Chesterfield. And as this topic bears much upon the result of our inquiries, I must enter into some detail.

Joseph Hendrickson, in his answer, says, " There have been for many years past, a monthly and preparative meeting, of the said society of Friends of Chesterfield . . . at Crosswicks : . . . that the said meeting at Crosswicks, is under the control and jurisdiction of the said yearly meeting of Philadelphia : . . . that some of the members of a number of quarterly and monthly meetings, which were under the control and jurisdiction of the regular and constitutional yearly meeting, at Philadelphia, aforesaid . . . met at Philadelphia, on the third Monday in October, 1827, and then and there irregularly, and contrary to discipline, . . . formed a new yearly meeting of their own, which was adjourned by them to the second Monday of April, 1828 ; just one week before the time of the sitting of the regular constitutional yearly meeting : . . . that these religious dissensions and divisions found their way into the meeting of the society of Friends at Crosswicks, aforesaid : . . . that the Hicksite party, and Orthodox party . . . there, hold separate and distinct meetings, for business and worship, the former being under the jurisdiction and control of the new yearly meeting of Philadelphia, aforesaid, to which they have attached themselves, having renounced the jurisdic-

tion and control of the ancient yearly meeting aforesaid; the latter, being under the jurisdiction and control of the ancient yearly meeting." Stacy Decow, in his answer, says, " that for many years, there has been established, at Crosswicks, ... a preparative meeting of the religious society of Friends, or people called Quakers, called and known by the name of the Chesterfield preparative meeting of Friends, held at Crosswicks. There is also a monthly meeting of Friends established at the same place. That this defendant is now, and has been for twenty years and upwards, a member of the said several meetings : ... that the said Chesterfield preparative meeting of Friends at Crosswicks, to which he belongs, is the same preparative meet· ing of Friends at Crosswicks, under whose care the said school fund was placed : ... that the said Chesterfield preparative meeting of Friends at Crosswicks, of which this defendant is a member, holds communication with the yearly meeting of Friends established in Philadelphia, which the said Joseph Hendrickson, in his original bill, improperly calls the Hicksite party, ... and which yearly meeting, this defendant insists, is the yearly meeting of the ancient and true society of Friends. He denies that the society of Friends to which he belongs, have seceded from the faith, the religious institutions or government of the ancient and religious society of Friends, or from the ancient legitimate yearly meeting at Philadelphia ; but the time of holding it has been changed from the third second day in the fourth month, to the second second day of the same, ... there being no constitutional time for the assembling of the yearly meeting, the time of holding it was changed to the time it is now held. ... The said yearly meeting assembled again on the said second second day in the fourth month, 1828, and is now settled on its ancient foundations and principles. This defendant, therefore, denies that it is a new yearly meeting within the pale of one already in existence."

The testimony on this subject, of some of the witnesses, is to the following effect. *John Gummere*, 1 vol. *Evid.* 315 : " Burlington monthly meeting, is a subordinate branch of Burlington quarterly meeting, which quarter is subordinate to the Philadelphia yearly meeting." *Ibid*, 318 : " That yearly meeting ... is

held annually, on the third second day of the fourth month, at Arch street meeting-house, in Philadelphia." *Samuel Craft*, 1 vol. *Evid*. 334, says, "From my earliest recollection, I have been a member of Burlington quarterly meeting, and for about thirty-six years past, I have been a member of Chesterfield monthly meeting. This monthly and quarterly meeting now are, and have been during all that period, subordinate branches of Philadelphia yearly meeting, held for many years past in the meeting house on Arch street, on the third second day in the fourth month, annually." *Josiah Gaskill*, 2 vol. *Evid*. 297, says, "The monthly meeting which I am member of, does consider itself members of Burlington quarterly meeting, which considers itself members of the yearly meeting of Friends held in Philadelphia, on the second second day of fourth month, at Green street." *Ibid*, 301 : "The Burlington quarterly meeting . . . held at Chesterfield . . . have sent representatives to the yearly meeting of Friends held in Philadelphia in fourth month, ever since . . . the second second day in fourth month . . . at Green street, instead of Arch street. The yearly meeting at Green street I consider the yearly meeting of Friends . . . and because it is the same yearly meeting which, prior to 1827, had been held in Arch street." *James Brown*, 2 vol. *Evid*. 321, says, "These quarterly, monthly, and preparative meetings, are but parts of the one great whole, the yearly meeting. . . . The Chesterfield monthly and preparative meetings were component parts of the Burlington quarterly meeting. The Burlington quarterly meeting was a branch of the yearly meeting, which, in fourth month, 1827, was, and for many years before had been, held in Arch street, Philadelphia." . . . He "attended most part of the yearly meeting in Arch street, 1827, as a member of the society, and belonging to Chesterfield monthly meeting." *Ibid*, 322 : "We have not attached ourselves, as I apprehend, to any other yearly meeting than the yearly meeting of Philadelphia, that is reorganized, and held on the second second day in fourth month, annually. . . . We do not consider ourselves members of the yearly meeting held there (in Arch street) since 1827." "That portion of the Chesterfield preparative meeting which . . . continues to hold that meeting at the usual times and places ;" (that is to

July, 1832.

Hendrickson
v.
Decow.

77

say, the preparative meeting whereby Decow was appointed treasurer of the school fund, as is elsewhere shown and expressed,) " acknowledge themselves, or claim to be, a part of the monthly meeting which . . . still continues a member of the Green street yearly meeting." The testimony of the last witness, James Brown, demands peculiar attention, from the station he held, as clerk of the preparative meeting of which Decow is a member, and from the confidence reposed in that officer by the usages of the society, and the intimate knowledge he must acquire and possess of the acts, connections, and sentiments of the meeting.

It thus appears, there were and are two distinct bodies, each claiming to be the Chesterfield preparative meeting of Friends at Crosswicks, and each claiming to be the same meeting under whose care the school fund was placed, and yet, *de jure*, remains. I stop here a moment, to fix the time when these bodies were distinctly and separately organized, in order to ascertain whether it was before the appointment of Decow as treasurer of the school fund. And on account of the connection, it may be useful to look also to the higher meetings. The separation in the Burlington quarterly meeting, appears to have occurred in the eleventh month, 1827. *Samuel Emlen*, 1 vol. *Evid.* 325 ; *Josiah Gaskill*, 2 vol. *Evid.* 301 ; *Charles Stokes*, 2 vol. *Evid.* 207. The latter witness says, he " attended the Burlington quarterly meeting in the eleventh month, 1827. At that meeting a separation did take place." And in answer (229) to this question, "After the separation of which you have spoken, in 1827, did your quarterly meeting consider itself as a constituent branch of the yearly meeting held at Arch street, Philadelphia, on the third second day of fourth month ?" he answered, " The quarterly meeting considered itself a constituent branch of the yearly meeting of Philadelphia, which had been held some years previously at the Arch street house, on the third second day of fourth month; but which, owing to the circumstances which had grown out of the unsettled and divided state of society, it was concluded should be held on the second second day of fourth month."

The separation in the monthly meeting of Chesterfield, or the

session of two distinct bodies, and the transaction of business separately by these bodies, took place as early as ninth or tenth month, 1827. *Samuel Emlen,* 1 vol. *Evid.* 324, 328, 331 ; *Samuel Craft,* 1 vol. *Evid.* 336, 337 ; *Josiah Gaskill,* 2 vol. *Evid.* 284. He fixes the time, the tenth month, 1827, and says, " There did a separation take place in Chesterfield monthly meeting in that month." He farther states, (296,) that the Chesterfield monthly meeting with which he was united, did, at their meeting in that month, appoint representatives on behalf of that meeting, to attend the contemplated yearly meeting to be held in Philadelphia, in that same month ; and in this respect he is fully supported by the book of minutes, which is before us as an exhibit : and he farther testifies, that the representatives, with one exception, attended the yearly meeting in the tenth month, 1827.

The separation in the preparative meeting of Chesterfield, bears date in the twelfth month, 1827. *Samuel Emlen,* 1 vol. *Evid.* 325 ; *Samuel Craft,* 1 vol. *Evid.* 339, 347 ; *Josiah Gaskill,* 2 vol. *Evid.* 286. The latter witness says, (287,) that after those who separated left the preparative meeting, the meeting proceeded in first month, 1828, to appoint trustees of the school fund, and that Decow was appointed treasurer at the same meeting. The testimony of James Brown is very explicit and satisfactory on this topic, and its importance, from the station he held as clerk of the meeting, has been already suggested. He says, 2 vol. *Evid.* 323, that the appointment of Stacy Decow as treasurer of the school fund, was made after the time when the separation of the preparative meeting of Chesterfield into two bodies or meetings, each calling themselves the Chesterfield preparative meeting, took place.

It thus clearly appears, that before the appointment of Decow as treasurer, there were formed and existed, two distinct bodies, claiming to be the Chesterfield preparative meeting of Friends ; the one of them connected with a body calling itself the ancient yearly meeting of Friends of Philadelphia, which holds its sessions on the third second day of April, in a meeting-house on Arch street ; and the other, and by which Decow was appointed, which disclaims all connection with the above mentioned

yearly meeting, is connected with another body calling itself the ancient yearly meeting of Friends of Philadelphia, which holds its sessions on the second second day of April, in a meeting-house on Green street. It also appears there are two separate bodies, styling themselves and claiming to be, the ancient and constitutional yearly meeting of Friends of Philadelphia. There is, however, and there can be, as is asserted and admitted by all, but one ancient yearly meeting, and but one body entitled to that appellation. This truth is distinctly admitted by the pleadings of the parties; it is plainly asserted by the book of discipline, which all who claim to be of the society of Friends, as do all the parties, and if my memory is correct, all the witnesses, in the cause, unqualifiedly admit to be their standard and their guide; and it is testified by several of the witnesses, whose depositions I have already noticed; to which may be added that of Halliday Jackson, an intelligent and well informed witness examined on the part of Decow: 2 vol. *Evid.* 155.

We are now brought to the inquiry, which of these two bodies or meetings is the ancient yearly meeting of Friends of Philadelphia? an inquiry, which, if I may judge from my own feelings and reflections, is of the deepest interest and importance. There is, and can be, but one Chesterfield preparative meeting of the society of Friends. There is, and can be, but one yearly meeting. A preparative meeting must be connected with the yearly meeting of Philadelphia, and without such connection, no assemblage is a preparative meeting. One of these bodies, or preparative meetings, is connected with the one, and the other with the other of the yearly meetings. Which, then, is the yearly meeting? Or, to confine our inquiry within the only requisite range, is the meeting or body assembling on the second second day of the fourth month, at Green street, the ancient yearly meeting? If it is, Decow is the treasurer. If not, as I have already shown, Hendrickson, once the acknowledged treasurer and the obligee, named as such in the bond, is entitled to the money. When such consequences hang on this question, may I not call it interesting and important? May I not stand excused, if I approach it with great anxiety and deep solicitude?

In the latter part of the seventeenth century, and at a very early period in the progress of the settlement of New-Jersey and Pennsylvania, the number and condition of the followers of George Fox, or the people called Quakers, rendered it desirable they should be brought under a common head, according to the form of ecclesiastical government adopted in England, and already existing in some of the more ancient colonies. In the year 1681 or 1685, (the precise time seems to be controverted, and cannot influence our present pursuits,) a yearly meeting was established, comprehending the provinces of New-Jersey and Pennsylvania, and the members of that religious society and their already organized meetings and judicatories of inferior grades. This body was not a mere incidental, casual, disconnected assemblage, convening without previous arrangement, ceasing to exist when its members separated, and formed anew when individuals came together again at some subsequent time. It was a regularly organized and established body, holding stated sessions, corresponding with other bodies of the same religious denomination, consulting together for the welfare of a portion of their church and its members, the ultimate arbiter of all differences, and the common head and governor of all belonging to the society of Friends, within its jurisdiction, which extended over the territories just mentioned, while they were called provinces, and since they assumed the name and rank of states. The meetings of this body were held annually, as its name imports, and as long and steady usage has wrought into a part of its essential structure. The time and place of convention are subject to its control, and have, accordingly, in several instances, been fixed and altered by it. The time and place, however, when and where only the body can constitutionally assemble and act, must, when fixed, so remain, until "the voice of the body," "in a yearly meeting capacity," which alone has the power and right "to govern its own proceedings," shall resolve on and enact a change. Such is certainly the rule of constitutional law, as applicable to this body; and such was their own practical construction of it, in the year 1798, when in the consciencious discharge of duty, they assembled, undeterred by the ravages of pestilence and the arrows of death. From the year 1685, for nearly a

century and a half, this body held its periodical sessions; for years, alternately at Burlington and Philadelphia, and finally in the latter city alone; and there, successively, at their houses on Pine street, on Keyes' alley, and on Arch street. Changes in time and place have occurred; but always by a previous resolve, by "the voice of that body," "in a yearly meeting capacity." In 1811, the place was fixed in the meeting-house on Arch street. In 1798, the time was changed to the third second day of the fourth month of each year; and by the book of discipline, promulged by the yearly meeting in 1806, and as already observed, the acknowledged constitution of this religious community, the latter day is declared the period for its convention. No other day is mentioned; no other day is provided for under any circumstances; nor is any occasional, intermediate, or special meeting authorized.

In the year 1826, at the prescribed time and place, a meeting was held. After the transaction of its business, it adjourned, according to the ancient and wonted form, "to meet in the next year at the usual time." This body, thus convened and thus adjourned, was, without dispute, the Philadelphia yearly meeting of Friends. On the third second day of April, 1827, at the house on Arch street, the designated time and place, a meeting assembled. It was composed of the representatives from the several quarterly meetings, and of all such individuals as inclination or duty had brought together. The regular constituent parts were there. Those who are since so openly divided by name, perhaps by feeling, peradventure by principles, then sat down together; one in form, if not in spirit; in unity of body, if not of mind. The clerk of the preceding year, according to ancient rule, opened the meeting in due order; for however simple, there was, nevertheless, an established ceremony. The representatives were called, certificates of visiting strangers were received, epistles from corresponding bodies were read, committees were arranged, the usual affairs of the occasion were transacted in unity and peace. The representatives were, in wonted manner, desired to abide for the next step in the progress of business. This body thus convened, was assuredly the yearly meeting; and up to the close of the forenoon, it sustained its consti-

tutional existence. If that assemblage ceased to be the Philadelphia yearly meeting, something which occurred subsequent to the close of the first sitting must have wrought out that result.

July, 1832.

Hendrickson
v.
Decow.

Such result was produced, say the defendant, Decow, and the meeting whereby he was appointed treasurer. This body ceased to be the yearly meeting of Friends, was dissolved, broken up "into its individual elements," (*Abraham Lower,* 1 vol. *Evid.* 421,) and reorganized in the ensuing autumn, in the yearly meeting which assembled in Green street, which became invested with the constitutional powers and rights incident to the Philadelphia yearly meeting, and the successor, or rather the continuance of the same body, which had been formed in the seventeenth century, at Burlington, and had from thence conducted and governed the affairs of the society, and connected with itself the subordinate meetings, and this whole religious community.

Our next duty, then, is to examine the causes which are alleged to have deprived this body of constitutional existence. And these are, first, the acts of the body in a collective capacity; second, the omission of the body to perform certain collective duties; and, third, the designs, plans, views, feelings and acts of individual members. Under one or other of these is comprehended, it is believed, every operating cause suggested in the pleadings, in the testimony of the witnesses, and in the arguments of the counsel.

The only acts alleged against the body in a collective capacity, are two in number. First, the appointment of a clerk of the meeting; and secondly, the appointment, near the close of the session, of a committee to visit the subordinate meetings.

*First,* The appointment of clerk to the meeting. To regard the act against which this complaint is directed, *as the appointment of a clerk,* is an entire misapprehension. It was, in truth, no more than the continuance in office of the former clerk; and as it seems to me, so far from an act of the body in its collective capacity, in violation of any rule, it was a strict, and under the circumstances in which the meeting was placed, an unavoidable compliance with, and adherence to, the ancient custom and order of the society.

According thereto, the nomination of clerk is to be made, not

in or by the meeting at large, but by the representatives, as they are called, or in other words, the persons deputed by the several quarterly meetings to attend, not merely as individuals, but as the organs of those meetings, in their official character.

The representatives, pursuant to the request already mentioned, remained at the close of the forenoon session, to discharge this duty. It is not my purpose to inquire into, or relate in detail, what passed among them. In the result, they could not agree, or did not agree, on the names of any persons to be proposed for the offices of clerk and assistant; and a report to this effect was made to the yearly meeting, when it opened in the afternoon. No nomination was offered. Put, now, the case in the strongest view; suppose the representatives had wantonly, or in neglect of their trust, omitted to propose names to the meeting? Was all further proceeding at at end? Was the meeting closed? The Book of Discipline, it is true, prescribes no guide or directory under such circumstances. But ancient custom, founded on the obvious dictates of reason, had established in this respect an operative law. The clerk and his assistant, of the preceding year, were to act, and without any new appointment or induction, were authorized to continue to discharge their appropriate functions, until the names of other persons were regularly brought forward, and united with, or in other words, appointed. In accordance therewith, and in view of the condition of the meeting, and of the difficulty which existed, an aged member (William Jackson) who had attended more than sixty years, and had thus acquired experience, perhaps, beyond any individual of the assembly, rose and stated, that "it had been always the practice for the old clerks to serve until new ones were appointed;" and he proposed to the meeting, "that the present clerks should be continued for that year." (*Thomas Evans*, 1 vol. *Evid.* 265.) Some difference of opinion occurred and was expressed, as to the course most eligible to be pursued. Some persons wished to refer the subject again to the representatives, for farther consideration. "Several of the representatives gave it as their opinion, there would be no advantage in so referring it, as there was not the smallest probability that they could agree. The first person who expressed this opinion, was one of

July, 1832.

Hendrickson
v.
Decow.

those who have since" united with the meeting in Green street; "and he added, that although he should have been in favor of a change in the clerk, if it could have been satisfactorily accomplished, yet as that was not likely to be the case, he thought the meeting had better proceed with its business. Several others of the same party expressed similar sentiments. Meanwhile a considerable number of those" who remain attached to the Arch street meeting, "expressed their approbation of the continuance of the present clerks, and a minute *desiring the old clerks to continue to serve the meeting*," (*Samuel Bettle*, 1 vol. *Evid.* 68,) was made and read. "On the reading of the minute, some of those who" now belong to the Green street meeting, "still continued to object, when one of their number remarked, he believed it was the best thing the meeting could do, under all the circumstances, and advised them to submit to it, as he did not think it would make so much difference to them, as some of them might imagine. Similar sentiments were expressed by one or two others of that party, and all objections to the appointment having ceased, John Comly, the assistant clerk, was requested to come to the table. He did not immediately do so, nor until several of his friends expressed that they thought that the business of the meeting had better go forward." The usual business then proceeded. This view, is chiefly extracted from the testimony of Thomas Evans. It is fully sustained by the depositions of Samuel Bettle and Joseph Whitall, and is, in no material point, impugned by any contradictory evidence. Some other witnesses, who speak of these transactions, are not so full and minute in detail, and some, it is to be regretted, do not recollect the occurrences of very interesting moments; as, for example, one of them, speaking of the afternoon of the first day, and having related some of the events, added, "The meeting proceeded on that afternoon: I don't remember particularly what took place:" *Halliday Jackson*, 2 vol. *Evid.* 54. In their opinions, in their inferences, in their feelings, we observe, as might be expected, a difference among the witnesses, but it is pleasing to meet with no such collision of facts, as to render necessary the delicate and arduous duty of weighing and comparing evidence.

78

It is, however, said, the greater number of the representatives wished to release the former clerk, and to nominate another in his stead; that a proposal was made to take their sense by a vote; and that this measure, which would have resulted in a majority for a new clerk, was prevented and defeated, by the conduct of those who sought to retain the services of the former officer.

One of the peculiar and distinguishing characteristics of this people, consists in their mode of transacting business and arriving at conclusions; in which, rejecting totally the principle that a majority, as such, is to rule, or decide, or govern, they arrive at an unity of resolution and action, in a mode peculiar to themselves, and entirely different from that common to all civil or political, and to most ecclesiastical bodies. They look and wait for an union of mind; and the result is produced, not by a vote or count of numbers, but by an yielding up of opinions, a deference for the judgment of each other, and an acquiescence or submission to the measure proposed. Where a division of sentiment occurs, the matter is postponed for farther consideration, or withdrawn or dismissed entirely; or, after sometimes a temperate discussion, and sometimes a silent deliberation, those who support, or those who oppose a measure, acquiesce in the sense of the meeting as collected and minuted by the clerk; and they believe the "spirit of truth," when the meeting is "rightly gathered," will be transfused through their minds, and they will be guided and influenced "by a wisdom and judgment better than their own," and that their clerk will be led to act under "the overshadowing of that power, which is not at his command, and which will enable him to make proper decisions." One of the witnesses examined on the part of Decow, informs us, the clerk "collects, not by an actual count of numbers, or recording the yeas and nays, yet by an estimate of the prevailing sense, which the meeting, after discussion, usually settles with sufficient distinctness, one way or the other:" *Charles Stokes,* 2 vol. *Evid.* 249. The account given by Clarkson, in his Portraiture of Quakerism, is represented to be correct, although never expressly recognized by the society. "When a subject is brought before them, it is canvassed to the exclusion of all extraneous matter, till some

conclusion results; the clerk of the meeting then draws up a minute, containing, as nearly as he can collect, the substance of this conclusion; this minute is then read aloud to the auditory, and either stands or undergoes an alteration, as appears by the silence or discussion upon it, to be the sense of the meeting; when fully agreed upon, it stands ready to be recorded :" 1 *Clarkson's Portrait. Quak.* 157. The world at large, and especially those who have not closely observed the practical operation of these principles, in the peace and harmony and prosperity of the internal affairs of this religious community, may be strongly inclined to call in question their expediency. A republican spirit may see no just rule, but in the voice of a majority. A jealousy of power may suspect too much confidence in the fairness and candor of the clerk. But the conclusive answer to all such suggestions and suspicions is, that they are free to act as their judgments and consciences may dictate. We are not to interfere with their church government any more than with their modes of faith and worship. We are to respect their institutions, and to sustain them. Nor can any individual be hereby aggrieved. He is under no restraint to remain among them. Whenever he is persuaded that either their faith or their practice, does not accord with his own views of reason and scripture, he is at liberty to leave them, and to seek elsewhere, more purity, more spirituality, more christian and scripture order, more safety, more republicanism, or more peace. The constitution of this society neither recognizes nor makes provision for a vote, or a decision on the principle of numbers, in any instance or predicament. The minutes and journals of the various meetings, not merely within the bounds of this yearly meeting, but within the pale of the whole society, do not furnish, so far as we are able to learn, a single record of a vote taken, or a count of numbers. The instances of reports made by the major part of committees, form no exception to the universality of this rule of action. Nor do the few, 'I say few emphatically, compared with the myriads of decisions standing on their records, nor do the few minutes, which industry has gleaned up, of expressions like these : "the greatest part of Friends think it best," or "it appears to be the most general sense," serve to show that a vote was taken, or that

July, 1832.

Hendrickson
v.
Decow.

July, 1832.

Hendrickson
v.
Decow.

numbers, as such, prevailed, or that the minor part did not freely relinquish their views, and cordially acquiesce in those of the greater part. Let us, for example, look to the minutes of Ches-terfield monthly meeting, of sixth month, 1691, because it is of Chesterfield, and of very ancient date. " The building of the meeting houses being taken into consideration, a meeting house on this side is generally agreed upon to be built, and the greatest part of Friends think it best to have it at the grave yard." Here is no allusion to a vote, nor any thing to indicate that all did no acquiesce in what the greatest part thought best. Barclay, in his treatise on Church government, gives the following explanation, and most pointedly condemns the rule of the greatest number. " The only proper judge of controversies in the church, is the spirit of God ; and the power of deciding lies solely in it, as hav-ing the only unerring, infallible and certain judgment belonging to it ; which infallibility is not necessarily annexed to any per-sons, person or place, whatever, by virtue of any office, place or station any one may have, or have had, in the body of Christ ; that is to say, that any have ground to reason thus, because I am, or have been, such an eminent member, therefore my judg-ment is infallible, or because we are the greatest number :" *Bar-clay on Church Government*, 78. Hence then, I think, we are not called to inquire how far the allegation as to the relative numbers of the representatives, is correct, and we may justly dismiss from farther consideration, the objection that the old clerk would not have received a majority of votes. The very propo-sal to take a vote, was an overture to depart, and the consum-mation of it would have been a departure, from an ancient and unvarying practice, which had not only grown up to an over-shadowing tree, but had its root in religious faith, and was nour-ished and sustained by religious feeling.

The inquiry, too, is of little importance, since, as I have shown, the omission of the representatives to agree in, and propose a nomination, only resulted in a continuance of the former officers, and did neither abridge, impair or destroy, the power of the meeting to provide for collecting and recording their acts and proceedings.

Let us, then, return to the yearly meeting. Here again, it is

July, 1832.
———
Hendrickson
v.
Decow.

said, a majority was opposed to the farther service of the former clerk, and his continuance contrary to their will, was not only an oppression of the few over the many, but was in fact a dissolution of the body. I am not able to say, from the evidence, if in any wise material, that even at the outset, this continuance was inconsistent with the wishes of the greater part of the meeting. But if such were the truth, it is abundantly shown, there was an acquiescence in the measure, even if an unwilling one. And this acquiescence was brought about by the agency and recommendation of some of those who are now the members of the rival yearly meeting. The following facts are stated by the witnesses. "A proposition came from a leading member." (*Joseph Whitall*, 1 vol. *Evid.* 218.) After the minute was read, "one of their number expressed his belief it was the best thing the meeting could do under all the circumstances, and advised them to submit to it:" *Thomas Evans*, 1 vol. *Evid.* 266. "One, and perhaps there were others, stated as their belief, it would be right, and encouraged his friends to accede to the proposition" for the continuance of the former clerks: *Joseph Whitall*, 1 vol. *Evid.* 217. "Efforts were made by persons, who have since" united with the Green street meeting, "to induce an acquiescence with the minute. At length, all opposition ceased :" *Samuel Bettle*, 1 vol. *Evid.* 69. Here, then, might have been opposition and dissatisfaction at the outset. But it is clear there was an ultimate acquiescence. And it is too much for any one, especially for those who took an active and influential part in bringing about this result, perhaps we may say, actually induced the peaceful result, to make it the subject of complaint, or to insist that the existence of the body was thereby destroyed.

There is another fact worthy of much consideration, in looking into the propriety of these proceedings; which is, that no person, save Samuel Bettle, the former clerk, was proposed for the office. The importance of this circumstance in civil affairs, is thus shown in the recent American treatise on the law of corporations. "Where a majority protest against the election of a proposed candidate, and do not propose any other candidate, the minority may elect the candidate proposed :" *Angel and Ames on Corp.* 67.

After all these events, I can have no hesitation in yielding to the entire and unqualified conviction, that the body remained in its pristine vigor, and proceeded to business as the Philadelphia yearly meeting of the society of Friends.

The other act, whereby, it is said, the discipline was violated, the society separated, and the constitutional existence of the yearly meeting destroyed, is the appointment of a committee to visit the subordinate meetings.

It would be very difficult, I think, to demonstrate, that an act of this nature, if not warranted by the discipline, or even if inconsistent with it, could work such sweeping results. The purpose and authority of this committee, were simply to visit, counsel and advise the inferior meetings, with no power, whatever, to act upon or control the rights or interests of any one, save by measures of persuasion. How far the temper or motive, which led to the appointment of this committee, may have been reprehensible, I shall examine under another head. It is to the act alone, that my attention is now directed ; and the act itself, was, in its nature, harmless. Let us, however, look more closely into the circumstances. They are thus represented by one of the witnesses. "A proposition was brought from the women's meeting . . . to appoint a committee to visit the quarterly and monthly meetings. This called forth a great deal of excitement, . . . and great opposition was made to it. Even some few of the Orthodox party themselves, did not, at first, appear to approve of it. But there were others of that party that strenuously urged the propriety of such a committee being appointed, and as they seemed to understand one another pretty well, apparently, they pretty soon united in urging the measure. It was, however, strongly opposed by much the larger part of the meeting ; I cannot undertake to state the proportions, but I should think myself safe in saying, two-thirds of those that spoke. But it seemed all of no avail, . . . and having a clerk at the table subject entirely to the dictates of his party, he made a minute and took down the names of the committee that were offered to him. No Friend, I believe, undertook to mention a name :" *Halliday Jackson*, 2 vol. *Evid.* 56. Another witness gave the following representation :—"At the last sitting, on seventh day morning, a proposi-

tion was introduced from the women's meeting, to appoint a committee to visit the respective subordinate meetings, for their strength and encouragement. To this there was a decided objection made; some Friends then in the meeting and now attached to each of the parties, opposed it. The doubt of some was, that it had better not be decided at that time; with others, there was a decided opposition to the measure. At this juncture, a Friend stated to the meeting the out-door proceedings, the private meetings, and opened the whole subject. It appeared to me evidently to create uneasiness and alarm on the part of those who had been concerned in those meetings; some of them called in question the accuracy of the statement that had been made, and seemed disposed to deny it; some did deny it; others, however, said that the general statement was correct, and acknowledged it. The propriety of appointing a committee under such circumstances, appeared so very obvious, that the opposition, in a great measure, ceased for that time; after which there was a greater and more general expression of unity with the measure, than" the witness, a clerk of several years' experience, " had often, if ever, seen or heard." " I had," says the witness, " been watching the course of events, as clerk of the meeting, to know how to act; and when all opposition had ceased, and it was very apparent it was the sense of the meeting that the appointment should be made, I rose and stated that I had had my doubts, when this proposition was first brought in, whether it was expedient to adopt it at that time, but as the servant of the meeting, it being manifestly its sense, I should now proceed to make the minute, and accordingly made it, and united with them in their views; and a committee was appointed pursuant to the minute:" *Samuel Bettle,* 1 vol. *Evid.* 69. Whatever difference may be in these statements, as to matters of opinion; whatever suspicions may have been enkindled; whatever motives or designs may be imputed, here is no substantial discrepancy as to points of fact.

Was, then, the appointment of such a committee a novel, and therefore an alarming occurrence? More than one witness testifies, and no one denies, that it was an ancient custom of the society: *Samuel Bettle,* 1 vol. *Evid.* 70; *Halliday Jackson,*

July, 1832.

Hendrickson
v.
Decow.

2 vol. *Evid.* 133. Had the meeting power to make such appointment? Aside of the multitude of unquestioned precedents, a witness says, " during the discussion of the proposition, there was no suggestion of a doubt of the right and power of the yearly meeting to appoint such committee; the difference of opinion was confined to the expediency of making the appointment at that time :" *Samuel Bettle,* 1 vol. *Evid.* 70. Was the purpose of the appointment laudable? It was to advise and counsel the inferior meetings, in the language of one of the witnesses, " for their strength and encouragement." And if the design was to prevent schism and separation, the end was, surely, commendable; and if the measures taken to attain it, were otherwise, the censure should rest on the committee, the agents, and not on the meeting, the constituents. Was partiality exercised by the clerk, or any other person, in the selection of the committee? No name which was proposed was rejected. Was there opposition to the appointment? Strong and decided at the outset. Was there, at length, an acquiescence? "A greater and more general expression of unity than usual," says one witness. " The opposition pretty generally, if not altogether ceasing," says another witness, " the meting proceeded to appoint :" *Joseph Whitall,* 1 vol. *Evid.* 218. Another says, "As all opposition ceased, a minute was made, and the committee appointed :" *Thomas Evans,* 1 vol. *Evid.* 268. These matters of fact, are, I believe, uncontradicted. One of the witnesses, indeed, intimates, that the clerk made the minute, being subject entirely to the dictates of his own party. But the clerk himself, whose veracity and candor are not only above reproach, but beyond suspicion, and who surely best knew his own motive of action, says, that though doubting at first the expediency of the measure, he made the minute, as the servant of the meeting, and because it was manifestly their sense that the appointment should take place.

Upon a careful examination of this measure, I can see nothing, either in the act itself, or in the manner of its inception, progress or adoption, subversive, in the slightest degree, of usage or discipline; and least of all, any thing of such vital influence as to break asunder the bonds of union, disfranchise the meeting, deprive it of constitutional existence, disrobe it of ability farther to execute

its ancient and appropriate functions, or to release from their allegiance all those who previously owed fealty and submission to it.

These, then, are all the overt acts of the meeting, which have been made the subject of complaint. It would, however, be a great error to suppose, that a session of five or six days was spent in these matters alone. Much other important business was transacted; all, I believe, it may be said, of the usual stated duties were discharged. Halliday Jackson gives the following brief but satisfactory account of what was done. "The business of the yearly meeting was proceeded in; and the usual subjects that occupy that body, such as considering the state of the society from the answers to the queries that are brought up from the different quarterly meetings in their reports; the reading of the minutes of the meeting for sufferings; reading reports from the committee who stood charged with Westown school, and some other matters; which occupied the meeting through the week:" 2 vol. *Evid.* 55. Another witness says, "All the business usually transacted at a yearly meeting, was gone through with, and several acts consummated, which no other body than the yearly meeting of Philadelphia was competent to perform:" *Thomas Evans*, 1 vol. *Evid.* 267.

Having thus reviewed what was done, we are now to turn our attention to what was not done by the meeting; for the latter, as well as the former, has been urged as an act of separation and disfranchisement of the yearly meeting.

Certain subjects, regularly brought before that body, were not acted upon, but postponed. "When the reports," says one of the witnesses, "were taken, or the subjects contained in the reports, from the different quarterly meetings, which were considered as new matter; such as the account from the southern quarter respecting the meeting for sufferings, rejecting their representatives, and an application, I think, from Bucks quarter, respecting the manner of choosing representatives to constitute the meeting for sufferings, together with ... two cases that came up from Philadelphia quarter ... they were all put by, and not acted upon, except the matter in relation to Leonard Snowdon's case, which, if I remember right, was returned to the quarterly meeting. It

79

seemed to be pretty generally understood, that the meeting was not in a qualified state, owing to the interruptions to the harmony that had taken place, to enter upon the investigation, or more properly, the consideration of these subjects :" *Halliday Jackson*, 2 vol. *Evid.* 55. It should be observed in general, that these subjects were not the regular stated business of the meeting, but occasional or special. In this remark, I do not mean to deny or detract from their importance, or the propriety of their having, at a suitable season, the most careful attention ; but simply to show their real nature and character ; and that to act on or omit them could not touch any vital part of the constitution of this body. A much more important consideration is, that the disposition of these subjects, the course which was adopted and pursued in respect to them, was the united act, and according to the common wish, of all parties, of even those by whom, or through whose instrumentality, they were brought before the meeting. This important fact is denied by no witness, and is expressly declared by more than one. The statement of one I have just now given. Farther being asked, if the subject from the southern quarter was not dismissed at the suggestion of Robert Moore, a member from that quarter, he answered, " When that subject was brought before the yearly meeting, it was drawing towards the close of the week, and by that time it was evident the yearly meeting was not in a qualified state to act upon any important subject ; and therefore, that subject, as well as two others, were dismissed without being much urged by Friends. I have not a clear recollection, but it seems to me that Robert Moore did say something about that subject from the southern quarter." Being asked if the subjects from Bucks and Abington were not dismissed at the instance of John Comly, he answered, " I have no recollection of who spoke first on the subject. John Comly was sensible of the state the yearly meeting was in ; and I can state what I have frequently heard John Comly say, that Samuel Bettle first suggested to him the propriety of having those subjects dismissed, all those subjects that came up in the reports, and wished John Comly to use his influence with his friends to have those subjects from Bucks and Abington dismissed, and he, Samuel Bettle, would use his influence with his

friends to have that subject passed over that was coming up from Philadelphia quarter; which subjects, it was apprehended, would produce a great deal of excitement in the yearly meeting, and which Samuel Bettle feared the consequences of; but how far that influenced John Comly in favor of putting off those subjects, I cannot say:" *Halliday Jackson*, 2 vol. *Evid.* 132. Another witness, Abraham Lower, being asked whether the propositions from Bucks and the southern quarter, were not disposed of at the instance of members from those quarters, respectively, and who, since the separation, have joined that portion of the society with which he was in unity, answered, "I have no recollection of the members of those quarters making such a proposition, but I should think it quite probable:" *Abraham Lower*, 1 vol. *Evid.* 392. And the same witness, in another place, testified, "As that yearly meeting was acknowledged, not qualified to enter upon the matters brought up from the quarters, that case, with others, was concluded not to be attended to:" *Abraham Lower*, 1 vol. *Evid.* 373. Samuel Bettle says he mentioned to John Comly, "Had you not better withdraw the propositions for a change, ... coming from Bucks, Abington, and the southern quarter? He said he thought so too, united with me fully in that view, and said they had better be withdrawn, as it was not likely they would ever be adopted, and would only occasion confusion and difficulty. The propositions, when again brought before the meeting, were withdrawn by common consent:" *Samuel Bettle*, 1 vol. *Evid.* 69. Thomas Evans testifies thus: "Those subjects were all connected with, or had grown out of, the controversy respecting the doctrines of Elias Hicks; and as there was a general understanding that his friends were about to separate, and form a society of their own, those subjects were, at their suggestion, or by their consent, referred to the meetings from which they had come, or suspended:" *Thomas Evans*, 1 vol. *Evid.* 276. "In the disposition of these subjects, there was a united conclusion of the meeting, after as full an expression of opinion as is usual; and those that took part in this business, some of them now belong to the new meeting, and others remained with the old society, and participated with the delibe-

rations of the meeting which led to those conclusions:" *Samuel Bettle*, 1 vol. *Evid.* 87.

Thus, then, it appears, these omissions took place, certainly with the consent, and probably at the request, or upon the suggestion, of the very persons who now complain. Under such circumstances, this measure, by no means unusual—for Abraham Lower testified that he has known cases brought to the yearly meeting and laid over for the consideration of the next—does not afford ground for censure, much less for annihilation, and least of all on the objection of those who, if they did not actually bring it about, were consenting thereto.

But, it is said, the meeting was not in a qualified state to enter upon the consideration of these subjects. What then? Was this unqualified state peculiar to one portion, or common to all? Was the meeting thereby dissolved? If wonted harmony ceased to prevail; if the minds of the members had become so sensitive on particular points that the introduction of them would produce agitation and excitement, unfavorable to cool, deliberate and dispassionate investigation and decision, it was the part of prudence, of christian forbearance, of enlightened reason, of patience and meekness, and of that spirit of peace and submission which, may I not say without offence to others, so eminently characterizes this religious denomination, to wait in humble expectation of the overshadowing of that Power who can say, as well to the stormy passions of the human breast as to the torrent and the whirlwind, " Peace, be still." But if such a state of things be a dissolution, no human society can be held together, and attempts at order and government, instead of the means of curbing, and restraining, and controlling the wayward passions of man, do but afford him the opportunity of giving them extended and unbridled influence and action.

Besides these considerations, which are, I trust, sufficient conclusively to sustain the meeting in its constitutional existence, there are some others, founded on the acts and conduct of the members, and of the component parts of the society at large, or the subordinate meetings, which incontrovertibly evince the acknowledged existence of the meeting, and its direct recognition

as such, not only during its session, but after it had closed its services for the year.

John Comly, and I feel at liberty to refer to him, though an individual, from his eminent standing and distinguished character, both private and public, as a man and as a minister, as well as from the prominent part he bore in the transactions which attended the separation in this society,—John Comly acted throughout the meeting, from the commencement to the close, as its organ, as an officer of the yearly meeting of Philadelphia. He did, indeed, request to be excused from serving in that capacity. But the fact remains that he did serve, and the reasons he gave for being inclined to withdraw, strengthen the inferences to be deduced from the fact. Few men are, I believe, more distinguished for purity, candor, and every other virtue. Did he say, I cannot serve this meeting, because I am not lawfully and rightly appointed an assistant, and to act as such would be, in me, usurpation and oppression? Did he say, he had been recorded as assistant "in opposition to the voice of the larger part of the meeting?" Did he say, "the hedge was broken down," the meeting was disorganized, a revolution had occurred, there was no longer a yearly meeting, but the society was dissolved into its original elements? Halliday Jackson testifies thus: "The next morning, I believe, John Comly did not take his seat at the table at the opening of the meeting, as usual." In this particular, perhaps not a very important one, the witness afterwards corrected himself, and said he believed Comly took his seat at the table by the side of the clerk, when he first came into the meeting, (2 vol. *Evid.* 132,) "but soon after, he got up, and made a very forcible appeal to the yearly meeting. I think he regretted the state and dilemma into which the yearly meeting appeared to be brought; that there were two parties, evidently two parties, that appeared to be irreconcilable to each other, and therefore not qualified to proceed in the weighty concerns of a yearly meeting under those trying circumstances, and proposed that the yearly meeting might adjourn, and Friends endeavor to get cool and quiet in their minds, and that possibly they might be favored to come together again at some other time, and be more in the harmony. ... And although John Comly expressed

his uneasiness at acting as assistant clerk, at the request of some of his friends, and some of the other party also, he submitted again to go to the table :" *H. Jackson,* 2 vol. *Evid.* 54.    Other witnesses state the transaction, not differently, though somewhat more fully.    "On third day morning, immediately after the opening minute was read, John Comly rose and stated, that he had mentioned at the previous sitting, that he should go to the table in condescension to the views of his friends, and that it was in that feeling that he was now there ; that the meeting was divided into two distinct and separate parties, and that under present circumstances those parties were irreconcilable ; that each of these parties was striving for the mastery, and that if either of them gained the ascendancy, it must be to the grievance and oppression of the other.    He therefore proposed that the meeting should suspend all further business, and adjourn ; but if the meeting was resolved to proceed in its business, at all hazards, he could not conscienciously act as the organ of a meeting made up of such conflicting parties, and must therefore request to be permitted to retire.    His proposal ... was but feebly supported. ... His party strongly objected to his leaving the table, urged his continuance, and that the meeting should now proceed with its business.    John Comly then rose, and stated, that as he found the meeting was not prepared to adjourn, he was willing, after the usual expression of approbation, to determine the sense of the meeting on his remaining at the table, so to continue, and to proceed with the business :" *Thomas Evans,* 1 vol. *Evid.* 266. " He took his seat, prepared to act, and the business did progress, he acting as usual, without making any farther objection on his part :" *Samuel Bettle,* 1 vol. *Evid.* 69.

Having seen the conduct of this very active and very useful member, as he is called by one of the witnesses, (*Abraham Lower,* 1 vol. *Evid.* 392,) let us briefly advert to that of the other members of the meeting, who now belong to the meeting in Green street.

Their urgency that John Comly should act as assistant clerk, and that the business of the meeting should proceed, has just been mentioned.    " The yearly meeting of 1827, was entirely conducted as it had been on previous occasions :" *Samuel Bet-*

*tle,* 1 vol. *Evid.* 94. " During that meeting, persons who have since joined the other meeting, were appointed on committees, and took an active part in the concerns of the meeting throughout :" *Ibid.* In the afternoon of the first day's meeting, some of the friends of John Comly " expressed, that they thought the business of the meeting had better go forward :" *Thomas Evans,* 1 vol. *Evid.* 266. " During all the remaining sittings of the yearly meeting, he (John Comly) and his friends continued their attendance, took part in its deliberations, assented or dissented from its conclusions, as opinion led them, and addressed it as the yearly meeting of Philadelphia :" *Thomas Evans,* 1 vol. *Evid.* 267. " During the last hour of the sitting, all the proceedings were read over, as is usual at the close of the yearly meeting ; no objections were made by any one, to any part of the minutes ; the concluding minute was also read, adjourning the meeting until the next year, at the usual time and place, if the Lord permit." This conclusion is the form common on such occasions. "After this minute was read, a considerable pause ensued ; there was no objection made to it, and Friends separated from each other in the usual manner :" *Samuel Bettle,* 1 vol. *Evid.* 70 ; *Thomas Evans,* 1 vol. *Evid.* 268. " Those who have since" joined the Green street meeting, " were generally present at the time of the adjournment. The yearly meeting was as large and numerous at the last sitting, as at any sitting during the week :" *Joseph Whitall,* 1 vol. Evid. 218.

One of the transactions of this meeting deserves, in the present connection, particular notice. " There was one matter before the meeting which was of a humane and benevolent character, that Friends, perhaps, of both parties, were pretty much united in :" *Halliday Jackson,* 2 vol. Evid. 56. " That was to raise three thousand dollars to aid our brethren in North-Carolina, in removing out of that state many hundred colored people, eight or nine hundred of them at least, who were under the care of the Carolina yearly meeting, and whose liberties were in jeopardy, unless they removed out of the state. This sum it was proposed should be raised by the different quarterly meetings, in the usual proportions. This was entirely united with ; not a single dissentient voice ; a great many expressing their views, and a

minute was made, directing the quarterly meetings to raise the money and pay it to Elias Yarnall, the treasurer of the yearly meeting. The quarterly meetings that compose the yearly meeting, all assembled, and in conformity with the direction contained in the extract from the yearly meeting, raised their quotas of the three thousand dollars, and paid it to Elias Yarnall, the treasurer :" *Samuel Bettle,* 1 vol. Evid. 70. Chesterfield preparative meeting bore its wonted part. This transaction is of an unequivocal character. The resolve was an act, not of private or individual benevolence, but of the meeting in its collective capacity. The recommendation, by the extract, was such as that meeting alone could perform. All, we are told, united in it. Not a dissentient voice. It was received by the several quarterly meetings as an act of the yearly meeting, and carried into effect as such, and the monies were transmitted to the treasurer ; thereby making, after the close of the yearly meeting, a direct recognition of its existence and authority. The effect of these circumstances cannot be weakened by the "humane and benevolent character" of this work of charity. It was indeed proof of a noble and munificent spirit. But suppose the general assembly of the Presbyterian church, or the Protestant Episcopal convention, had sent missives or extracts to the quarterly meetings, enjoining the donation, and to make their treasurers the channels of conveyance, would the call have been obeyed ?

I do not pause to answer, but proceed to the consideration of another of the heads into which this cause has been divided, the designs, plans, views, feelings and acts of individual members of the society ; and under this head I shall notice, so far as I think it necessary, the conduct of subordinate meetings, and of what has been called the dominant party.

And here I make some general remarks, which indeed in my judgment, furnish an answer, a decisive answer, to many of the conclusions which have been drawn or suggested from the facts which, on these points of the case, appear in evidence.

*First.* Our concern is with the yearly meeting in its collective capacity. Our purpose is to ascertain whether that body holds or has ceased to hold, a legal existence ; whether the body which met on Arch street, and continued and closed its session there, in

April, 1827, was the constitutional yearly meeting of the society? Whether the yearly meeting then assembled, performed its functions and adjourned? or whether that assemblage, at its opening, in its progress, or at its conclusion, ceased to be the ancient and legitimate yearly meeting? Whether the venerable edifice remained, or its place exhibited only a deplorable pile of ruins?

*Second.* As such, then, are our concern and purpose, we have little to do with the causes of division and separation, about which so much has been said and written in the course of this cause, or with the division and separation, except so far as they may operate on the legal existence of the assemblies of this society. A separation has, indeed, taken place. Those who formerly offered their sacrifices on a common altar, now no longer worship or commune together. Many who once went up to the ancient temple, have left it, and go up to another mount. They had the right to do so. Our civil and religious liberty, whereof we have such just reason for congratulation and gratitude, left them free from all restraint, save conscience and the divine law. We are not here to approve or condemn them, nor to inquire into their motives, nor to estimate their strength, or their purity, or their consistency with the light of truth, whereby all profess to be guided. I wish to judge no " man's servant. To his own master he standeth or falleth." I hope to be able to continue and close this investigation, without any inquiry into religious faith or opinions. Not that I doubt the power of this court. For while I utterly disclaim the idea that this court, or any court, or any human power, has a right to enforce a creed, or system of doctrine or belief, on any man, or to require him to assent to any prescribed system of doctrine, or to search out his belief for the purpose of restraining or punishing it in any temporal tribunal, I do most unqualifiedly assert and maintain the power and right of this court, and of every court in New-Jersey, to ascertain, by competent evidence, what are the religious principles of any man or set of men, when, as may frequently be the case, civil rights are thereon to depend, or thereby to be decided. In a greater or less degree it is done daily. Who avail themselves of it more frequently than the society of Friends, when, on the ground of

*Right margin:*
July, 1832.

Hendrickson
v.
Decow.

80

religious faith, they claim and enjoy an exemption from the use of an oath in our courts of justice? How far, then, this separation may have been proper, or whether the causes of it will stand the scrutiny, which, in the great day of account, they must undergo, we are not to resolve. Its effect on this society, and the ancient assembly, is the outermost bound of our inquiry.

*Third.* Inasmuch as our research properly, and almost exclusively, relates, as I have endeavored to show, to the yearly meeting in its collective capacity, it is of little worth to inquire into the plans, designs, or views of individuals, or even the acts of inferior bodies, since these, however incorrect, or hostile, or indefensible, can have no great influence on our main pursuit; for if individuals were ambitious, not lowly, arrogant, not humble, domineering, not submissive, and were destitute of the mild and forbearing spirit of christianity; if a party had sprung up, resolved, as was said, "to rule or to rend;" if even monthly or quarterly meetings had violated the wholesome rules of common discipline, it by no means follows that the bonds of the society were broken, their compact dissolved, their discipline at an end, their constitution destroyed, and their existence annihilated. Such a government is a mockery, a pretence. It has not the consistency of even the mist of the morning. The plain and irresistible truth, that such a government, so wholly unadapted to the condition of mankind, could not exist, abundantly proves that such principles are unsound. The basis of all government, is the truth taught by every page of history, that turbulent passions will arise, that acts of violence will be committed; and the purpose of government is to control, to regulate, to repress, to remedy such passions and conduct. If otherwise, the edifice is built of such stuff as dreams are made of, and is as unsubstantial and as little to be valued as a castle in the air. If the state of Georgia should disregard the decision of the federal judiciary, or even resist the executive power of the United States, is the constitution dissolved? If designs exist in South-Carolina "to rule or to rend," our government, surely, is not therefore annihilated. It may be said, these are but parts, small parts of the Union. Is it not in like manner said, the adherents of the

Arch street meeting are a minority, a small minority? Gough, in his history, makes this judicious and appropriate remark: " The independency claimed by the discontented party, is incompatible with the existence of society. Absolute independency in society being a contradiction in terms:" 3 *Gough's Hist.* 24.

This view of the subject would, I think, excuse any examination in detail; yet to see these principles in their practical application, as well as farther to illustrate the matter, and to leave, if possible, nothing without notice, which is urged as bearing on the result, I shall briefly advert to some of the prominent topics of dissatisfaction and complaint.

" The most prominent cause of" the division in the society, " of a public nature, I consider to be," says one of the witnesses, (*Abraham Lower*, 1 vol. *Evid.* 354,) "the public opposition or disrespect, manifested by the members of Pine street monthly meeting, by the agency and influence of Jonathan Evans, in breaking up the men's meeting, or closing it, whilst Elias Hicks was, with the consent and approbation of that monthly meeting, engaged in the women's department in the prosecution of his religious concern." The occurrence took place " between 1819 and 1821 :" *Ibid.* Now, if a prominent member of that meeting was guilty of rudeness or impropriety, it is plain, that he should have been individually dealt with, brought to confess his error, or disowned. If the meeting, as such, acting from his example, or under his influence, were guilty of censurable disrespect, " such meeting ought" to have been required " to render an account thereof." I use, here, the words of the book of discipline, the meaning of which is well understood. But it is claiming too much to assert, that the society is thereby rent asunder, when no measures to punish the offenders were ineffectually essayed, when years have shed their healing influence over it; or that the religious rights and privileges of all the other meetings and members, within a large district of territory, have been jeoparded, and the subsequent sessions of the yearly meeting been unwarranted, and their acts usurpation and oppression.

Another complaint against individuals, and against the meeting for sufferings, is called " an insidious effort to palm a creed upon a society which never had a creed:" *Abraham Lower*,

July, 1832.

Hendrickson
v.
Decow.

1 vol. *Evid.* 369. The affair is thus represented by the witness who uses the expression I have quoted :—" The minds of some of the members of that meeting appeared to be anxious that something should be done to keep the minds of the members of the society from imbibing sentiments which seemed to be growing common among its members. The suggestion was made to get up a pamphlet, to be composed of extracts from the writings of our early Friends ; and from what some of us saw of the disposition of those persons, who have since denominated themselves Orthodox, . . . we felt afraid that something was about to be got up, calculated to trammel our consciencious rights, and when the pamphlet was prepared, a small number of us expressed our dissatisfaction with the undertaking, and with the matter of the pamphlet, fearing, that in the hands of arbitrary men, a construction might be given to some of the views in that pamphlet, that would abridge the right of private judgment. . . . There were, I think, ten thousand of them printed, . . . but it was detained, not published. And when the minutes of the meeting for sufferings came to be read, as usual, in the yearly meeting, to my surprize, that pamphlet appeared to be recorded on the minutes, and when it was read, the yearly meeting appeared very much dissatisfied with it. It was proposed, and generally united with, and so expressed, that it should be expunged from the minutes of the meeting for sufferings. . . . It was finally left, with the conclusion that it should not be published. It was considered in the light of a creed, and that by this course of leaving it on the minutes of the meeting for sufferings . . . that when the minutes should be read in the yearly meeting, and that as a part of them, that it would be adopted by society, foisted upon them in that insidious way :" *Abraham Lower,* 1 vol. *Evid.* 368. On the other side, the following representation of this affair was made : " It has been the custom of the society, whenever any of its doctrines or testimonies are misrepresented in works that are published, to endeavor to induce the editors of those works to give the views that Friends hold in respect to the doctrines thus misrepresented. In the year 1822, there was a discussion in a public paper, printed at Wilmington, conducted under the signatures of Paul and Amicus ; Paul attacking Friends, and Amicus

speaking in their behalf, and in a manner, too, which showed that he was speaking for the society, clearly. After this discussion had progressed for a considerable time, Amicus avowed doctrines, as part of the christian faith, which we could not accord with; they appeared to be of a socinian character, at least. These essays being about to be reprinted in form of a book, ... the meeting for sufferings, in the regular order of their proceedings did ... notice it, by appointing a committee. ... The committee pursued the usual course, ... prepared a statement of what were the views of Friends, ... making extracts from various approved authors. The meeting united with the report of the committee, and made a minute on the subject. The editor did publish the minute in his paper, but declined saying any thing on the subject in his book. The meeting were under the necessity of publishing these extracts themselves, and did print an edition of it. In the yearly meeting of 1823, when the minutes of the meeting for sufferings were read, considerable objections were made to that part of the proceedings. ... The excitement being considerable, the meeting adjourned until the next morning. When the meeting assembled the next morning, it was proposed that the extracts should be stricken off the minutes of the meeting for sufferings; objection was made to that, on the ground that it would be a disavowal of the doctrines held by Friends, these extracts being taken from the writings of approved Friends." ... It was "proposed to them to avoid both difficulties, by simply suspending the publication, not taking it off the minutes, and not circulating the pamphlets, but leaving the subject. This proposition was finally acquiesced in, and the business so settled :" *Samuel Bettle*, 1 vol. *Evid.* 72. How far this explanation may serve to show that the measure was in conformity with ancient custom, and called for by the exigency of the occasion; or how far it was an insidious effort to impose a creed; or how far the fear was well founded that an attempt was made to trammel consciencious rights, or to abridge the right of private judgment, I shall not undertake to decide. It is enough to say, that if such a design existed, if such an effort was made, the design was frustrated, the effort was defeated; and the authors of it met with a just, though silent rebuke. But the attempt did not impair the

solidity of the yearly meeting to which it was proposed.   I can-
not believe that the proposal, by a committee of congress, of an
unconstitutional or oppressive law, would annihilate that body,
or abrogate the constitution.    The wildest and most visionary
theorists would not, I believe, venture on such bold and untenable
ground.

   This matter of religious faith and doctrine, of a creed, has
directly or indirectly filled up a large portion of the volumes of
evidence before us; was the subject of many remarks in the ar-
guments of the counsel at the bar of this court; has been the
cause of much anxiety and alarm ; and misunderstandings in
respect to it, have, I doubt not, had great influence in bringing
about the lamented rupture in this most respectable society.   I
fear the matter has been greatly misunderstood, if not greatly
misrepresented.    This society has, and from the nature of things
must have, its faith and doctrines, its distinguishing faith and
doctrines.    They would, unhesitatingly, repudiate the tenets of
Confucius, of Bramah, or of Mohammed.    They believe " in
Christ and him crucified."    They bear both public and private
testimony of their faith.    They have repeatedly declared it, and
published it to the world.    They have a confession of faith, and
a catechism.    A declaration of faith was issued on behalf of the
society, in the year 1693—was approved by the morning meet-
ing of London, and published by the yearly meeting of Phila-
delphia, in or about 1730.    It is, I suppose, the same which is
to be found in Sewell's History, (2 vol. 472.)    It purports to be
" a declaration of what our christian belief and profession has
been and is," and contains an exposition of belief, in respect to
Jesus Christ, his suffering, death, and resurrection, and the ge-
neral resurrection of the dead, and the final judgment.    Sewell,
(2 vol. 483,) gives what he calls " a confession of faith," which
was, by George Whitehead and others, presented to parliament
in December, 1693, and begins thus : " Be it known to all, that
we sincerely believe and confess."    The yearly meeting, as early
as 1701, by their direction and at their expense, circulated Bar-
clay's Apology, and his Catechism and Confession of Faith, as
containing the doctrines and tenets of the society of Friends.
What is a creed, but an exhibition of faith and doctrine ?   Why,

July, 1832.

Hendrickson
v.
Decow.

then, should the tocsin now be sounded among a people, who, a well-informed member tells us, have more frequently than any other religious community, exhibited to the world their principles and their faith? Were the early Friends less anxious for the cause of truth, less jealous of encroachment on their religious freedom, less willing to bear testimony against error and to suffer for their testimony, less prompt to discern insidious efforts, less fearful of attempts to trammel conscience or abridge the right of private judgment? The observations of Robert Barclay, in a treatise on church government, published under the sanction of the society, and several times printed by the yearly meeting of Philadelphia, (*Thomas Evans*, 1 vol. *Evid*. 304,) are fraught with so much good sense, practical wisdom, and genuine piety, that they cannot be too frequently pondered by all, of every name or sect, who feel an interest in the cause of religious truth and order. " Whether the church of Christ have power, in any cases that are matters of conscience, to give a positive sentence and decision, which may be obligatory upon believers. I answer affirmatively, she hath; and shall prove it in divers instances, both from scripture and reason ; for, first, all principles and articles of faith which are held doctrinally, are, in respect to those that believe them, matters of conscience. ... Now, I say, we being gathered into the belief of certain principles and doctrines, without any constraint or worldly respect, but by the mere force of truth on our understanding, and its power and influence upon our hearts, these principles and doctrines, and the practices necessarily depending upon them, are, as it were, the terms that have drawn us together, and the bond by which we became centered into one body and fellowship, and distinguished from others. Now, if any one or more, so engaged with us, should arise *to teach any other doctrine or doctrines*, contrary to these which were the ground of our being one, who can deny but the body hath power, in such a case, to declare, *this is not according to the truth we profess*, and, therefore, we pronounce *such and such doctrines to be wrong*, with which we cannot have unity, nor yet any more spiritual fellowship with those that hold them. ... Now, this cannot be accounted tyranny and oppression. ... Were such a principle to be received or believed, that

in the church of Christ no man should be separated from, no man condemned or excluded the fellowship and communion of the body, for his judgment or opinions *in matters of faith,* then what blasphemies so horrid, what heresies so damnable, what doctrines of devils, but might harbor itself in the church of Christ? What need then of sound doctrine, if no doctrine make unsound? ... Where a people are gathered into the belief of the *principles and doctrines* of the gospel of Christ, if any of that people shall go from their principles, and assert things false, and *contrary to what they have already received,* such as stand and abide firm in the faith have power ... to separate from such, and to exclude them from their spiritual fellowship and communion:" *Barclay's Anarchy of the Ranters,* 53, &c. On the present occasion it is not my purpose, because for the determination of the controversy before us I do not find or deem it necessary, to inquire whether the society of Friends can, or may, or will, according to their rules, disown a member who holds unsound or heretical doctrines, who should disavow all the essential principles of christianity, and profess to believe that Jupiter and Mars and Apollo, and the fabled deities of Olympus, are the true gods, or that the "blood of bulls and of goats should take away sins;" but simply to show that the society, as such, have their faith, their principles, their doctrines, their peculiar faith, their distinctive principles, their characteristic doctrines, without which a man may be a heathen, a mohammedan, or even a christian, but cannot be one of the people called Quakers. Can I mistake in this, when I read such a passage as I have quoted from Barclay, a standard of the society, acknowledged, received, revered as such? What is his work just named, what is his 'Apology,' but an exposure of doctrine, of principle, of faith, of the doctrine, principle and faith of the Friends, avowed by them, published by them, resorted to by them as their light and guide in the hours of darkness, and doubt, and difficulty; in those trying hours, which come to them as they come to all men of religious feeling, when the light within needs oil, and the flickering flame of hope to be made steady and brilliant. Can I mistake, when the book of discipline, with uncommon solicitude, requires each preparative meeting of ministers and elders, no less than

July, 1832.

Hendrickson
v.
Decow.

three times in every year, to certify to its quarterly meeting, in answer to one of the queries, "whether ministers are sound in word and doctrine?" Soundness is a relative term, meaning freedom from error and fallacy, and necessarily requiring some standard whereby the word and the doctrine may be judged. The doctrine to be sound, must be conformable to some standard; and does not the query, then, assert that a standard exists in this church; and that thereby the doctrine of the minister may, by his fellow man, be compared and tried? If, however, I may mistake in thus reverting to these venerated sources, let us for a moment recur to the evidence. Abraham Lower, (1 vol. *Evid.* 369,) says, in connection with this subject, "The society, believing now as they did in the first foundation of it, that the bond of union by which it was bound together, was and is, 'the life of righteousness.'" Is not here a direct assertion, that there is a belief, and a belief not merely of individuals, but of the society as such? And he refers for an exposition, published and expressed, to the author and the book from which I have just quoted. In this connection, I recur farther, to the first document emanating from Green street, dated fourth month, 1827. "Doctrines held by one part of the society, and which we believe to be sound and edifying, are pronounced by the other party to be unsound and spurious." Now, I may be allowed to ask, why speak of doctrines, if the society, as such, has no concern with them? How are doctrines ascertained to be unsound and spurious, or sound and edifying, if there be no standard of faith and doctrine, no creed? Why should this difference or departure from a sound belief, be made a subject of complaint? How is such a denunciation to be reconciled with the alarm at a creed, or the dreaded attempt to control conscience and abridge the right of private judgment?

The meeting for sufferings, by the rejection of certain persons appointed by the southern quarter as representatives, are charged to have given "reason to apprehend that they were determined to control the operations of society according to their wills," and to have furnished "evidence of their having dissolved the compact, and so far as their own influence extended, and their

own acts could extend, separated itself from the society :" *Abraham Lower*, 1 vol. *Evid*. 370.

The meeting for sufferings, is a subordinate department for the business of this society, and especially to exercise care during the intervals between the sessions of the yearly meeting. If this body did improperly reject the representatives; if in this respect they violated the discipline, it is very obvious that their act, their unconstitutional act, could impart no censure whatever to the yearly meeting, much less destroy its existence. But the design, the motive, the ambitious and domineering spirit, which induced this conduct, these are, we are told, the consuming fires. The state of the case is shortly thus :—The meeting for sufferings is composed of twelve Friends appointed by the yearly meeting, and also of four Friends chosen out of each of the quarterly meetings; and the book of discipline provides that "in case of the decease of any Friend or Friends, nominated either by the yearly meeting or quarterly meetings, or of their declining or neglecting their attendance for the space of twelve months, the meeting for sufferings, if it be thought expedient, may choose others in his or their stead, to serve till the time of the next yearly meeting, or till the places of those who have represented the quarterly meetings shall be supplied by new appointments :" *Book of Discipline*, 55. In the year 1826, the southern quarterly meeting resolved to release two of the persons who were then sitting as members of the meeting for sufferings under their appointment, and appointed others. The meeting were of opinion that such a measure was not contemplated by the discipline; that the quarter had a right to fill, but not to create vacancies; and that the only case which constituted a vacancy and called for a new appointment, was death, resignation, or neglect of attendance; neither of which then existed. The meeting for sufferings appointed a committee to confer with the quarterly meeting. The latter adhered to their resolution. The case was forwarded to the yearly meeting of 1827 for their care, and was one of those which, as already mentioned, were postponed : *Exhib. No.* 47, 2 vol. *Evid*. 477. Here, then, appears to have been a difference of opinion, on the construction of a clause in the book of discipline, respecting the power of the quarterly meet-

July, 1832.

Hendrickson
v.
Decow.

ing. Without undertaking to decide which is correct, there was certainly room enough for a diversity ; and I can see no reason, either in the relation of the witnesses, or in an examination of the controverted clause, to doubt that the opinion entertained by the meeting for sufferings, was honest and sincere, and not feigned or fraudulent; more especially if, as alleged, it was sanctioned by a practice of seventy years, coeval with the existence of that meeting. Now an honest diversity of opinion as to constitutional powers, could not " dissolve the compact ;" nor could the act of the meeting, in sending a committee to confer with the quarter, nor even their omission to yield to the determination of the quarter, until the matter could be investigated and decided by the ultimate and competent tribunal, the yearly meeting. But in whatever light we may view this matter, it is, as already observed, the act of the meeting for sufferings, not of the yearly meeting. The course pursued by the latter, and the reason of that course, have been already mentioned and considered. If, indeed, " this circumstance" had produced, as is said by one of the witnesses, (*Halliday Jackson,* 2 vol. *Evid.* 48,) " as great a sensation throughout the society, as, perhaps, any other circumstance that occurred previously to the yearly meeting of 1827," there needs be no surprise that this meeting should not be in a state to take it under consideration ; and the propriety of a postponement until time should have shed its calming influence, and the consistency of this course with the avowed principles and frequent practice of the society of Friends, are very manifest.

The remarks which I have made on these cases, selected by way of example, and for the sake of illustration, render it unnecessary that I should particularly notice, or enter at large into the statement or consideration of others of the same general character. If the principles which I have endeavored to establish, and have applied to these cases, are correct, the others can have no greater influence on the question of the continued existence of the yearly meeting.

Another point has been decidedly taken, on the part of those who maintain the dissolution and reorganization of the ancient yearly meeting, and which I have shortly, under this head, expressed by the phrase, " feelings of individuals." It is more at

large explained, in the first public document issued from the meeting in Green street, thus : " The unity of this body is interrupted ; a division exists among us, developing views which appear incompatible with each other, and feelings averse to a reconciliation." Now admitting this to be true, and it may, perhaps, be rather to be lamented than denied, that such incompatible views and averse feelings existed in both parts of this body ; what consequence can fairly, legally, upon any practical principles of human action, result to the existence of the meeting, and the connection of the society ? What consequence, on the pacific principles always maintained among the Friends ? If time, charity, a recollection of the common sufferings of themselves and their ancestors ; if prayer and supplication ; if the smiles of the Great Head of the church universal, would not change and reconcile these views, reverse and soothe these feelings, then might those who thought " the period had fully come when they ought to look towards making a quiet retreat," have justly said to the others, " Let there be no strife, I pray thee, between me and thee, and between my herdsmen and thy herdsmen, for we be brethren ! Separate thyself, I pray thee, from me ; if thou wilt take the left hand, then I will go to the right ; or if thou depart to the right hand, then I will go to the left." But without even an attempt at such voluntary separation, I can see no safe principle, which will entitle a portion of those who entertained such views and feelings, on account of their existence and prevalence, to disfranchise the rest, to declare the ancient meeting dissolved, the society broken up into its individual elements, and then proceed to erect among themselves a new body, and declare it the society of Friends, and its meeting, not merely a new yearly meeting, but the ancient and legitimate yearly meeting ; not a new yearly meeting, but the meeting resettled on its ancient foundations and principles.

If a portion of this religious community found, or believed to exist, in another portion, such feelings and views as rendered it impracticable for them any longer to fraternize, any longer peacefully, harmoniously and profitably to meet and commune and worship together, a very sufficient reason, in conscience, may have been thereby afforded them to withdraw, to make " a

quiet retreat ;" and the principles of the government under which we have the happiness to live, would have sustained them in the measure, and allowed them to join any other religious community, or form another association, of whatever name, for religious purposes. But the existence of such feelings and views, would not deprive those who remained of their ancient name, rights and privileges, if they retained their ancient faith and doctrine, maintained their wonted testimonies, and adhered to their ancient standards; nor would the act of withdrawal, even if by a majority, confer on them the form and name, the power and authority of the ancient community. In like manner, if a portion discovered in the rest, or in some of the more influential members, a determination " to rule or to rend," although hereby, in conscience, a sufficient reason to excuse or justify a withdrawal might be found, yet could not even a majority carry with them, the power and authority and rights of the whole, unless the disposition or determination had been carried out into overt acts; for, of the latter only, can men judge or be judged by their fellow men, while of the former, he alone can take cognizance, who knoweth the secrets of all hearts.

I have thus endeavored to examine and weigh, in detail, or by its principles, every argument which I have either heard or read, to prove that the body which sat in Arch street meeting-house, in April, 1827, was not, or ceased to be, the Philadelphia yearly meeting of Friends. The position is not maintained. At the closing minute, that body was the ancient legitimate yearly meeting, as fully as during the forenoon sitting of the first day, or as it had been at any point of time since the year 1685.

If this be true, if the body which then closed its functions for the time, in the usual manner, and by the ancient minute, was the legitimate body, it is enough for the present occasion, nor need we look at its future history, because the new body, which claims its power and place, assembled in the course of a few months, and before the recurrence of the next annual period. It may not, however, be unprofitable to state in this connection, as appears from the evidence, that in the year 1828, and since, annually, at the wonted time and place, meetings have been held, of such as have thought proper to attend, of the acknow-

ledged members of the ancient society, who have not been dis-
franchised by any act of any tribunal, claiming to represent the
society of Friends, or to possess or exert any power of disown-
ment.

If the body which thus held and closed its session, was the
regular, constitutional yearly meeting, it follows, as an inevita-
ble consequence, that the assembly which convened in October,
of the same year, in Green street, could not be, whatever name
it may have assumed, the ancient legitimate yearly meeting, the
common head and centre of the subordinate meetings, and of
the society of Friends in New-Jersey and Pennsylvania.    One
meeting being in life, another of the same powers, rights, and
jurisdiction, could not, according to the discipline of the society,
according to the simplest elements of reason, according to the
immutable rules of action, which must govern and control all
human assemblages, of whatever nature, whether religious or
civil; according, indeed, to the avowed doctrines of the plead-
ings in this cause, and the consentaneous declarations of coun-
sel, a second, a subsequent meeting could not be set up within
its bounds.    The yearly meeting, having convened and closed
in April, 1827, could not again convene, nor could any body,
possessing its powers and authorities convene, until the same
month of the succeeding year, 1828.    The place of meeting
was fixed by the voice of the yearly meeting, which alone had
the authority in this respect, and alone could change it.    The
time was directed by the constitution or book of discipline, to
which we have had so frequent occasion to refer.    The time
could, indeed, be altered by the yearly meeting, but by it alone.
There was no adjournment made by the yearly meeting to a
shorter day than the annual period.    There is no provision in the
constitution for an intermediate, or as it is commonly denomi-
nated, a special meeting; nor is authority given to the clerk, to
any portion of the members, or invested any where else, to call
such meeting.    Hence it clearly follows, that according to the
constitution, the yearly meeting could not again assemble, until
1828; and no body, of whomsoever consisting, or by whomso-
ever composed, which may have convened in the intermediate

period, could, conformably to constitutional principles, be the Philadelphia yearly meeting.

We learn, however, from the evidence before us, that on the nineteenth, twentieth, and twenty-first days of April, during the yearly meeting, and after its close, a number of Friends met together to confer on the state of the society. They resolved to meet again, and accordingly did meet, in the sixth month of that year, and then recommended that a yearly meeting should be held, on the fifteenth day of the ensuing month of October. A meeting was held at the Green street meeting-house. And this meeting is said by Stacy Decow, in his answer to the bill of interpleader, to be "the true and legitimate yearly meeting of Philadelphia," and by one of the witnesses, is called "the yearly meeting reorganized :" *Abraham Lower,* 1 vol. *Evid.* 404. We are now to examine whether it was so; and in the present inquiry I propose to lay out of view the fact, which I believe has been fully demonstrated, that the yearly meeting was actually in full vigor and capacity.

This inquiry is to be conducted under two different aspects; first, on the assumption that the constitution, or discipline of the society remained in force; and secondly, on the assumption that the hedge was thrown down, the bond of union unloosed, the society broken up into its individual elements, the constitution or discipline not providing for the emergency, or having crumbled into dust.

*First.* The constitution is in force. The time and place of the yearly meeting are fixed. April, not October, is the one; Arch street, not Green street, is the other. Neither can be changed without the resolution and authority of the yearly meeting. No such authority was given. On the contrary, the resolve of that body was, that the next yearly meeting should assemble on the third second day of April, at Arch street, at the usual time and place, "if the Lord permit;" and these latter words did not, as is asserted in the answer of Stacy Decow, constitute "a contingent adjournment," nor contemplate "the circumstance ... of Friends not being again permitted to assemble at that time;" but were designed to acknowledge their humble and entire dependence on the Great Master of assemblies, without whose permis-

July, 1832.

Hendrickson
v.
Decow.

sion they neither expected nor wished again to convene.   A special meeting of the yearly meeting is an anomaly, and unprovided for.   Neither the few nor the many, have power given to them to covoke such meeting.   If, then, the constitution was in force, the meeting in October was not the true and legitimate yearly meeting of Philadelphia.

*Second.* Let us now suppose the compact broken, the constitution dissolved, and the disjoined members at liberty to act from individual minds.   Was the meeting entitled to the name it then assumed ?   There are three insurmountable obstacles.   First, it was not convened as the ancient yearly meeting.   Second, the members at large, the only constituent parts, or in other words, the individual elements, were not, and a portion of them only was, invited to assemble.   Third, it was not composed or constituted as the ancient yearly meeting.

*First.* This October meeting was not called, nor did it come together, as the ancient yearly meeting.   The name which it thought proper then to assume, or which was then conferred upon it, cannot help this deficiency.   In the call which was issued, the faintest idea is not held out that the ancient yearly meeting was to be convoked ; no hint is given that the ancient meeting was to be reorganized, or to be settled on its ancient foundations and principles.   On the contrary, the idea is conveyed with comprehensible distinctness, that a new yearly meeting was to be formed.   The address, which bears date in June, contains, in the first place, an avowal of the design or object in view, " to regain harmony and tranquillity . . . by withdrawing ourselves, not from the society of Friends, nor from the exercise of its salutary discipline, but from religious communion with those who have introduced, and seem disposed to continue, such disorders among us."   There is nothing here of remaining in the ancient yearly meeting, nor of continuing or reorganizing it. But let us proceed.   " We therefore . . . have agreed to propose for your consideration, the propriety and expediency of holding," what ?   The ancient yearly meeting ?   No.   "A yearly meeting for Friends in unity with us, residing within the bounds of those quarterly meetings heretofore represented in the yearly meeting held in Philadelphia."   And farther, " It is recommended that

the quarterly and monthly meetings which may be prepared for such a measure, should appoint *representatives* to meet in Philadelphia on the third second day in tenth month next, at ten o'clock in the morning, in company with other members favorable to our views, there to hold a yearly meeting of men and women Friends, upon the principles of the early professors of our name." In this clause are several prominent points. First, the meeting was to be composed of representatives from the monthly as well as the quarterly meetings. Now, the ancient yearly meeting had no representatives from monthly meetings; certainly, since the discipline, as adopted and published in 1806. A *continuance* of the yearly meeting could not, then, have been contemplated, nor a reorganization of it, nor a settling of it on its ancient principles. Second, it was to be, not the Philadelphia yearly meeting, but "a yearly meeting of men and women Friends :" And thirdly, it was to be formed on the principles of the early professors of our name, not on the platform of the yearly meeting, as erected by the book of discipline.

*Second.* This meeting in October, was not so convened as to entitle it to assume the name, and to take the place of the Philadelphia yearly meeting.

If the yearly meeting was dissolved, and the society brought back to a mere collection of individuals ; if the state of things were such that individual minds might now form anew or reorganize, as they are said to have originally formed, it is a very clear proposition, and not to be controverted, that all the individuals of the society ought to have been called ; none should have been directly or indirectly excluded. Whatever dissensions had risen up, whatever animosities existed, the former members of the society remained such, and those who did not meet in Green street, in person or by representatives, were, as much as they who did, members and individual elements. All, then, had a right to be called, all must be called, all must be afforded an opportunity to assemble, or no convocation can be lawful, the true and legitimate yearly meeting cannot be there. Now, the recommendation or invitation to assemble, was not comprehensive, but exclusive, not general, but limited. A particular class or description only were invited ; all the rest were debarred and

July, 1832.

Hendrickson
v.
Decow.

82

shut out. The maxim, *expressio unius est exclusio alterius*, is adopted in the law, only because it is the dictate of common sense. For whom was the meeting? Who were to attend? "For Friends in unity with us." Not for Friends in general, not for the members of the ancient yearly meeting, but for such only as were in unity with those who made the proposal. Who were invited to send representatives? All the monthly and quarterly meetings? By no means. "The monthly and quarterly meetings *which may be prepared for such a measure*." This language cannot be misunderstood or misconstrued; and besides the representatives, for as we have heretofore seen, all who were led by inclination or duty, came in their individual capacity to the yearly meeting, who were to meet in company with them? All the society? All other members? Not so. "Other members favorable to our views." Was, then, the yearly meeting convoked? Was even a general meeting of the society of Friends called? Ingenuity cannot pervert, blindness cannot mistake, such perspicuity. If I may be permitted to use a term, because it is so common as to be well understood, and not because I mean to make any offensive application of it, the call was for the meeting of a party. I do not intend to say, a right party, or a wrong party, for the subject will, in its nature, admit of either qualification, but a party. And such a convocation, of a portion only of the society, the rest, whether majority or minority, or however small in comparative numbers, being excluded, cannot be the true and legitimate yearly meeting, cannot be the ancient yearly meeting reorganized and settled again on its ancient foundations and principles.

*Third.* The meeting in October was not composed or constructed as the yearly meeting.

I have, incidentally, adverted to this subject, in showing the nature of the call, or who were invited to attend the meeting; but I now present it as a characteristic difference between this assemblage and the yearly meeting. The yearly meeting is composed of members of two classes, individuals, and the quarterly meetings; the latter being represented by delegates. Such is not only the case since the present book of discipline was published by the society, but was the principle of organization when

this meeting was first established. Gough, the historian, says, "In the year 1669, it was found expedient and agreed upon, to hold a general meeting in London, representative of the whole body in England, and all other parts where any of the society were settled, which, having been henceforth held annually, is denominated the yearly meeting in London. This meeting is constituted of representatives deputed from each quarterly meeting in England, from the half-yearly meeting in Ireland, and sometimes from other parts, yet without restraining any member in unity with the society from attending :" 2 *Gough's History*, 163. But the meeting in Green street was composed of three classes, individuals, quarterly meetings, and monthly meetings ; some of the latter, as bodies, Mount Holly, Chesterfield and Radnor, being represented by their delegates : *Exhib.* 9. It is no answer, that members of this society are entitled to sit in their individual capacity, and therefore, whether there as individuals or delegates, can make no difference. This result does not follow. The representatives alone, it will be remembered, perform the important service of nominating a clerk to the meeting. And hence, the clerk who acted for, and was appointed by this meeting was nominated, at the least in part, by the representatives of monthly meetings, who were irregularly there. And the incongruity of this procedure farther appears from this, that the individual members first appointed, in their monthly meetings, the representatives of those meetings, and then themselves attended as individual members. It is manifest, therefore, the October meeting was not composed as a yearly meeting should, and could only, have been.

In the course of this investigation, it has repeatedly occurred to me, and every time with increasing force, that the grounds of division, if no difference of religious faith existed, were of an inferior and evanescent nature. It seems to me, though perhaps I am unable, not being a member of the society, properly to appreciate the matter, that patience, forbearance, brotherly kindness and charity, the meek and mild spirit which has been believed to characterize and adorn the genuine Friend, would, under the smiles and blessing of Providence, have wrought out a perfect reconciliation, have brought again these discordant minds to the

wonted harmony, and the unity of spirit would have again prevailed. If, indeed, a difference of faith and doctrine had grown up and become strong; if either portion had fallen off from the ancient principles of their church, and I use the term, here, as did Fox and Barclay and Penn, the breach is not the subject of surprise, and it must, with no less truth than regret, be said, " between us and you there is a great gulf fixed." In the pleadings of this cause, in the extended volumes of testimony, and in the laborious arguments of the counsel, I do not remember any charge that the members of the society, who remain connected with the Arch street meeting, have departed from the doctrines and principles of Friends, as stated by their founder and his early followers; and I rejoice that I have not been constrained to inquire into the charge of departure, so freely and frequently urged against the members of the Green street meeting. In any remarks I have made, I am not to be understood as asserting or countenancing such a charge. Nor do I mean to say, they either had or had not grounds and reasons sufficient to induce a separation. With these, I do not profess, for this court, in the present cause, to interfere. It is with the legal consequences of their acts, we are to concern ourselves. A separation of a portion does not necessarily destroy or impair, nor, as it respects legal existence, even weaken the original institution. This doctrine was distinctly asserted by the supreme court of this state, in the case of Den against Bolton and others, which arose on the division in the Reformed Dutch church of the United States.

Upon the whole, I am brought, by the most careful, faithful, and minute investigation of which I am capable, to the result, that the Arch street meeting was, and the Green street meeting was not, the Philadelphia yearly meeting of the society of Friends.

We are now to look for the consequences on the cause before the court. We have seen that every preparative meeting within the states of Pennsylvania and New-Jersey, which is, through and by its connecting links, connected with, and subordinate to, the yearly meeting of Philadelphia, is a preparative meeting of the people called Quakers; and any preparative meeting or assemblage of persons calling themselves a preparative meeting,

not thus connected and subordinate, is not a preparative meeting of that people, within the meaning of their constitution and discipline, and within the meaning of the subscription to the school in the present case, or in other words, the instrument whereby the trust fund was created. We have farther seen, that the preparative meeting having authority to appoint the treasurer of the school fund, is the preparative meeting of Chesterfield, connected with, and subordinate to, the yearly meeting of Friends of Philadelphia. We have seen that the preparative meeting whereby Stacy Decow was appointed treasurer, was not, at the time of that appointment, connected with, and subordinate to, the Arch street meeting, but had previously disunited itself therefrom, and connected itself with the Green street meeting; and that, therefore, it was not the Chesterfield preparative meeting of Friends, at Crosswicks, meant and mentioned in the establishment of the school fund, and had not competent authority to discharge Joseph Hendrickson and appoint a successor.

There is, then, no successor to the person named as treasurer in the bond and mortgage, and he has, consequently, the legal right to recover the money.

I do, therefore, respectfully recommend to his excellency the chancellor, to decree upon this bill of interpleader, that the principal and interest mentioned in the said bond, and intended to be secured by the said mortgage, of right belong, and are payable to the said Joseph Hendrickson, and that he be permitted to proceed on his original bill of complaint, or otherwise, agreeably to the rules and practice of the court of chancery.

CHARLES EWING.

DRAKE, Justice. The present controversy has grown out of the prosecution of a certain bond and mortgage, bearing date the second day of fourth month, (April,) A. D. 1821, executed by Thomas L. Shotwell to Joseph Hendrickson, treasurer of the school fund of Crosswicks meeting, to secure the payment of two thousand dollars, with interest, at six per cent., to the said Joseph Hendrickson, treasurer as aforesaid, or his successor, or to his certain attorney, executor, administrator, or assigns. Upon this bond, the interest had been duly paid until the second day of

July, 1832.

Hendrickson
v.
Decow.

April, A. D. 1827. The interest from that date, together with the principal, composes the sum now in dispute.

It is admitted, that the money for which these securities were given, is part of a fund, the principal part of which was raised about the year 1792, by the voluntary subscriptions of a considerable number of the members of the preparative meeting of the people called Quakers, at Crosswicks, in the township of Chesterfield, county of Burlington, and state of New-Jersey ; for the purpose of creating an interest, or annuity, " to be applied to the education of such children as now do, or hereafter shall, belong to the same preparative meeting, whose parents are not, or shall not be, of ability to pay for their education." And this fund was to be " under the direction of the trustees of the said school," (the school then established at Crosswicks,) " now, or hereafter, to be chosen by the said preparative meeting."

It is further admitted, that previous to the year 1827, there was but one preparative meeting of the people called Quakers, at Crosswicks ; although it was sometimes designated as the Chesterfield preparative meeting, at Crosswicks ; and at other times, as the preparative meeting of Friends, at Crosswicks. It was an association, or meeting, of the religious society of Friends ; and it had the power to appoint the trustees of the school, the treasurer, and other officers of the association.

Joseph Hendrickson, one of the above named parties, was appointed treasurer of this meeting in 1816, and was continued in that office, as all parties agree, until the summer or autumn of 1827, when disputes arose in that meeting, and others with which it stood connected, which resulted in the separation of one part of its members from the other part. One party, or division of that body, have continued the said Joseph Hendrickson in the office of treasurer. The other party, in the month of January, 1828, appointed Stacy Decow, another of the above named parties, to the same office, and have continued him in that office until the present time.

Both Hendrickson and Decow, claim to be the treasurer of the Chesterfield preparative meeting, and, in that capacity, to have the custody of this fund. As both *have been appointed*, although by different bodies, or different parts of the same body,

the title to the office must depend upon the appointing power; that is, the preparative meeting. And inasmuch as two several bodies pretend, each, to be the true preparative meeting, and one only is contemplated as the trustee of this fund, it becomes necessary to inquire which is the true preparative meeting.

It appears by the testimony, that on the twenty-seventh day of December, A. D. 1827, the Chesterfield preparative meeting of Friends was divided, by the minority of the members, assembled at that time, withdrawing to another house, leaving the majority, with the clerk, at the usual place of meeting. They con tinued their business there; and the minority organized anew, or held another meeting, having appointed a new clerk to act for them.

If this preparative meeting were an *independent body*, acting without the influence of any conventional principle operating upon this point, the act of the minority on this occasion would not affect the powers of the majority who remained in session; however it might expose itself, and the members composing it, to disabilities. But the right to make appointments, and to exercise the other functions of the preparative meeting, would still continue with the larger party: 7 *Serg. and Rawle*, 460; 5 *Binney*, 485; 5 *Johnson*, 39; 1 *Bos. and Pul.* 229; 2 *Dessausseure*, 583; 16 *Mass.* 418.

But the preparative meeting is not an independent body, but a component part of *the religious society of Friends*. Hence, it is necessary to examine its connection with the society of *Friends*, and the history of that society, so far as it influences the separation in this preparative meeting, in order to determine the question, which of these bodies is the true preparative meeting; and is, of course, entitled to appoint a treasurer, and to manage this fund.

The society of Friends, as it existed at the time when this school fund was created, and thence down to the year 1827, was an association of christians, bound together by a distinct government, peculiar testimonies, and, as one party contends, by certain religious doctrines, deemed by them fundamental. For their go-- vernment, the Friends residing in New-Jersey and Pennsylvania, as early as the year 1689, established a general meeting, called a

yearly meeting, in which the numerous inferior meetings have been represented, and which all the members of the society have had a right to attend : 1 vol. *Evid.* 333. That yearly meeting, soon after its institution, adopted and published certain articles of government, called, " Rules of discipline of the yearly meeting of Friends, held in Philadelphia." This is acknowledged by all the parties to this suit, as their system of government; and by that, so far as its provisions extend, all profess to be willing to be tried. In this publication, we find that their meetings for discipline are declared to be; (*Intro. Discip.* 3,) "First, preparative meetings, which commonly consist of members of a meeting for worship; second, monthly meetings, each of which commonly consists of several preparative meetings; third, quarterly meetings, each of which consists of several of the monthly meetings; and, fourth, the yearly meeting, which comprises the whole."

And the connection and subordination of these meetings, are declared to be thus; (*Discip.* 31,) " Preparative meetings are accountable to the monthly ; monthly, to the quarterly; and the quarterly, to the yearly meeting. So that, if the yearly meeting be at any time dissatisfied with the proceedings of any inferior meeting ; or the quarterly meeting with the proceedings of either of its monthly meetings ; or a monthly meeting with the proceedings of either of its preparative meetings ; such meeting or meetings ought, with readiness and meekness, to render an account thereof, when required."

This preparative meeting at Chesterfield, was established at an early period. It was, ever since its origin, connected with, and, in the sense of the book of discipline, subordinate to, the Chesterfield monthly meeting; which was subordinate to the Burlington quarterly meeting ; and that, to the Philadelphia yearly meeting.

Such were the connections sustained by this preparative meeting, at the commencement of the year 1827. I said, that we must review the history of the whole body, so far as it operated upon the division of the Chesterfield meeting, at the close of that year. During the same year, a division took place in the Philadelphia yearly meeting, which was followed up by divisions in all the subordinate meetings, or at least all with which this pre-

parative meeting was connected in its subordination.  The division so resulted, that as early as tenth month, 1827, there were two yearly meetings in existence, (1 vol. *Evid.* 622 ; vol. *Evid.* 457,) each claiming to be the truly yearly meeting of the society of Friends; one assembling in Arch street, and the other in Green street, Philadelphia.   Which of these two meetings was the head to which the inferior meetings should account, &c. according to the constitution of the society ?  They could not both be.   For in this case, it would not only be hard, but impossible, for the inferior meetings to serve two masters.  But which should it be ?  Upon this point the members of the inferior meetings could not agree.   And hence, a corresponding division took place in the Burlington quarterly meeting, in eleventh month, 1827, (2 vol. *Evid.* 207–8,) which resulted in two distinct quarterly meetings; one assembling at the city of Burlington, and the other at Chesterfield.   And a division also took place, in ninth or tenth month, 1827, in Chesterfield monthly meeting.   A dispute arising, respecting the propriety of granting a certificate of membership to an individual, to be presented to Green street monthly meeting ; which dispute was founded on the question, whether that meeting still retained its connection with the Arch street yearly meeting, or had joined that of Green street : the clerk, David Clark, not acting in reference to this matter with the promptness desired by the party in favor of making the certificate, they considered him as refusing, or at least, as neglecting to serve the meeting, and at once called another person, Jediah Middleton, to the chair, to serve them as clerk : 1 vol. *Evid.* 337 ; 2 vol. *Ibid.* 284.   After which, the two parties conducted their business separately ; the minority and old clerk, adhering to the Burlington quarterly meeting, in connection with the Arch street yearly meeting, and the other party sending representatives to the Green street yearly meeting : 2 vol. *Evid.* 296–7, 323.

It was after this complete division of the Chesterfield monthly meeting, that the transaction took place in the preparative meeting before noticed.   These meetings were composed, in some measure, of the same persons.   The clerk, James Brown, and many other persons there, had previously manifested their partiality to one or the other of the great parties which had grown

July, 1832.

Hendrickson
v.
Decow.

up in the society, and to their respective yearly meetings. In making out answers to the queries, which were, by the monthly meeting, in eleventh month, 1827, addressed to the preparative meeting, according to the book of discipline, page 89, the clerk of the preparative meeting had made return to Jediah Middleton, the clerk of that monthly meeting connected with the Chesterfield quarter, and Green street yearly meeting; (2 vol. *Evid.* 323,)—thus acknowledging the meeting of which he was clerk, to be a branch of that yearly meeting. He had also denied the authority of the monthly meeting, of which David Clark was clerk : 1 vol. *Evid.* 325 ; 2 vol. *Ibid.* 323. In eleventh month, 1827, the Burlington quarter, connected with the Arch street yearly meeting, appointed a committee to visit its subordinate meetings : 1 vol. *Evid.* 325-6. On the twenty-seventh of twelfth month, (December,) that committee presented themselves before the Chesterfield preparative meeting then assembled. A committee also presented itself from the Burlington quarter, connected with the Green street yearly meeting. An inquiry was made of the clerk, or meeting, in what connection this preparative meeting was then acting. No direct reply was given. It being manifest that the harmony of the meeting was broken, and all parties knowing the predilections of themselves and others to be so fixed, that it was useless to spend time in debate, the minority, wishing to sanction no proceeding which would change their connection or allegiance, withdrew ; protesting against any forfeiture of their rights thereby. Since which, the two parties once composing that preparative meeting, have each held its own meeting, in subordination to their respective monthly, quarterly, and yearly meetings, as before stated.'

Much investigation was made into the precise conduct of the respective parties, in effecting these divisions ; but I do not regard the particular acts, or formalities, observed by these subordinate meetings, as of much consequence, seeing there is a complete separation of the society into two distinct bodies, acting under separate governments ; although each still professes to adhere to the ancient discipline and worship. Our inquiry now must be, whether each of these bodies is to be considered as the society of Friends, contemplated in this trust, or only one of

July, 1832.

Hendrickson
v.
Decow.

them: And if but one, which is that one? And which yearly meeting represents it? For if there be but one society, and one yearly meeting which answers to the trust, the inferior meetings must follow the fate of those to which they stand connected. Every Friend is a member of this yearly meeting. It is the yearly meeting which overlooks, controls, and exerts a care over all that are in connection with it; which hears their appeals in the last resort; which preserves their uniformity in discipline, and in the maintenance of their peculiar testimonies; in a word, which identifies them as a body of *Friends.* And in order to determine which is the true preparative meeting at Crosswicks, we must ascertain which is the true yearly meeting of *Friends,* held in Philadelphia.

The yearly meeting was established in Burlington, in the year 1681 : 1 vol. *Proud's Hist. Penn.* 160-61. It was held alternately at Burlington and Philadelphia, from 1684 to 1761; after which it was removed entirely to Philadelphia, and was held there annually and in great harmony, until within the last ten or twelve years; within which time, jealousies have arisen among the members, which increased, until the meeting held in fourth month, 1827, which was the last held by the united body. The dissensions previous to, and at that meeting, came to such a height, that one party withdrew, and took measures for the formation of a new yearly meeting, as the other party insist, or as they say, for the reorganization and purification of the old one. It will be necessary to look a little into particulars, to discover the character of this transaction, and what should be its effect upon the present case. And I should have observed, that I use the word party, or parties, "Orthodox" and "Hicksite," in this opinion, merely to designate individuals or bodies of men, acting together, and not with any reference to the feelings, motives, or principles, upon which they may have acted.

Questions of importance were expected to arise at the yearly meeting of 1827, upon which disagreement was anticipated. The respective parties made such preparations for the approaching business of that meeting as they deemed proper. The clerk, being the officer who collects the sense of the meeting on the questions submitted to it, and declares its decisions, was justly

considered as holding an important station, which neither was willing to have filled by a person unfriendly to its views. The nomination of a clerk to the yearly meeting, was the appropriate business of the representatives from the quarterly meetings: 1 vol. *Evid.* 68, 217. In the meeting held by them for that purpose, Samuel Bettle and John Comly were nominated. Each party advocated the pretensions of its favorite candidate, but neither candidate was agreed upon. Upon its being reported to the yearly meeting, that the representatives were unable to agree, some person suggested, that it was the practice of the society for the old clerk to act until a new one was appointed: 1 vol. *Evid.* 68, 218. In this, there was at least a partial acquiescence of the opponents of the old clerk: 1 vol. *Evid.* 69, 218; 2 vol. *Ibid.* 21, 267, 392. He took his seat at the table, and John Comly, the rival candidate, took his, as assistant clerk. The next morning the latter expressed a repugnance to serve the meeting, made up, as he stated, "of two irreconcilable parties;" but for some reason or other, he again acquiesced, and acted as assistant clerk the residue of the meeting. One other subject of dispute occurred towards the close of that meeting. It was respecting the appointment of a committee to visit the inferior meetings. To this there was considerable opposition, but the clerk finally recorded a minute in favor of the appointment. After which, the meeting adjourned, "to meet at the same time and place the next year:" 1 vol. *Evid.* 70.

On the nineteenth, twentieth and twenty-first of April, 1827, and during the sitting of the yearly meeting, another meeting was held in Green street, at which an address to the society of Friends was agreed upon; which was subscribed, by direction and in behalf of said meeting, by John Comly and others; in which address, after alluding to the divided state of the society in *doctrine* and in feeling, and to measures of the yearly meeting deemed oppressive, they state their conviction, "that the period has fully come, in which we ought to look towards making a quiet retreat from this scene of confusion:" 2 vol. *Evid.* 454. They adjourned, to meet again in the same place on the fourth day of sixth month, (June,) 1827. At which second meeting, they agreed on and published a second address, in which, after

adverting to disorders and divisions in the society, and transactions of the late yearly meeting, against the sense, as they considered, of the larger part of that body, they add, "Friends have viewed this state of things among us with deep concern and exercise, patiently waiting in the hope, that time and reflection would convince our brethren of the impropriety of such a course, and that being favored to see the evil consequences of such conduct, they might retrace their steps. But hitherto, we have waited in vain. Time and opportunity for reflection have been amply afforded, but have not produced the desirable results. On the contrary, the spirit of discord and confusion have gained strength, and to us there appears now to be no way to regain the harmony and tranquillity of the body, but by withdrawing ourselves, not from the society of Friends, nor from the exercise of its salutary discipline, but from religious communion with those who have introduced, and seem disposed to continue, such disorders among us." The address concludes, by proposing for consideration, "the propriety and expediency of holding *a yearly meeting of Friends in unity with us*, residing within the limits of those quarterly meetings, heretofore represented in the yearly meeting held in Philadelphia, on the third second day in tenth month (then) next : 2 vol. *Evid.* 455, 456. At which time, a yearly meeting was accordingly held, in Green street, Philadelphia ; which has been continued, at the same place, from year to year ; and which is the same yearly meeting, to which the Chesterfield monthly meeting, of which Jediah Middleton is clerk, sent representatives, and to which that meeting, as well as the preparative meeting of which James Brown is clerk, gave in their adhesion : 1 vol. *Evid.* 50.

Which of these yearly meetings represents the society of Friends contemplated in this trust? A first view strongly inclines us to answer, it is that held in Arch street. That was regularly adjourned to meet at the same time and place next year, and was then held accordingly, and has been regularly continued until the present time. The other meeting was held, first, in tenth month, 1827, by those who *retreated*, or withdrew from the disorders of the other, at a new time, in form at least, and a new place. One is the *old* meeting, and the other the *new*. But some circum-

stances attending this separation, involve the case in some degree of doubt. Those who formed the Green street meeting, claim to be the *majority*. They complain of various abuses existing in the society for the preceding five years; that "measures of a party character were introduced" into some of their meetings for discipline; and that "the established order of society was infringed, by carrying those measures into execution *against the judgment, and contrary to the voice, of a larger part of the Friends present*." "At length, the infection taking a wider range, appeared in our yearly meeting, where its deplorable effects were equally conspicuous. Means were recently taken therein to *overrule the greater part of the representatives, and a clerk was imposed upon the meeting without their concurrence or consent*." And "a committee was there appointed to visit the quarterly and monthly meetings without the unity of the meeting, and *contrary to the solid sense and judgment of much the larger number of members in attendance :*" 2 vol. *Evid.* 456.

In connection with these complaints, we must take into consideration some peculiarities in the mode of conducting the religious meetings of Friends. It is insisted by the Arch street party, that the members of a meeting for discipline, are not entitled to equal weight in their decisions; so that the clerk, whose business it is to ascertain and record the sense of the meeting, should not count the number of persons present, and decide with the majority of voices, but should pay more attention to elderly, pious, and experienced men, than to those of an opposite character : 1 vol. *Evid.* 64, 184, 333. On the other side, it is insisted, that all have an equal voice, and that it is the duty of the clerk to record the opinion of the majority, in numbers; or at least, that he should not record a minute against the sense of the majority : 1 vol. *Evid.* 43; 2 vol. *Ibid.* 244. Another peculiarity is this, insisted on by the Arch street party, and apparently conformable to usage, that until the appointment of a new clerk, the old one is to act. It may be easily perceived, that the effect of these principles combined, may be to place a meeting under the control of a minority, however small, or even of the clerk himself; and that the majority have no *ordinary* means of re-

dress, for they never can appoint a new clerk, and never can carry any measure, however just and important, if unreasonably opposed. And, *if it be true*, that through the operation of these principles, the majority, in the yearly meeting of fourth month, 1827, was deprived of its rights, it would incline me very much, to endeavor to distinguish this case from that of an ordinary secession from the government of a religious society.

July, 1832.

Hendrickson
v.
Decow.

The complaint, that the majority was overruled, relates, I presume, more particularly to the meeting of representatives from the various quarters, whose business it was to nominate a clerk. But the proceedings there may have had, and were evidently, by all parties, expected to have, an important bearing on the proceedings of the yearly meeting. The facts are somewhat variously stated by the different witnesses. But, in the view I shall take of this question, I do not think it necessary to make a minute inquiry into the facts, or to decide those which are controverted.

It appears distinctly that no count, or other certain means of ascertaining the majority, was resorted to. The Green street party, however, claim the benefit of a presumption that they were the majority, arising from the fact that they insisted that the majority ought to govern, and endeavored to take measures to ascertain it : 1 vol. *Evid.* 372–3. This was resisted by the other party, either from conscious inferiority of numbers, or from a conscientious desire not to violate the ancient usage of the society, as to the mode of ascertaining the solid sense of a meeting.

As to the true mode of ascertaining the sense of a meeting, all agree that it is the duty of the clerk to collect it, and it has been the uniform practice in the society, for him to do so without resorting to a formal count, or division of parties : 1 vol. *Evid.* 64, 330, 458 ; 2 vol. *Ibid.* 169, 250. This society commenced in persecution, and has, heretofore, been distinguished for its harmony. Believing in the operation of the spirit of truth on their minds, not only in worship, but in business, if properly sought for, it has been their practice solemnly to seek the guidance of the light within, and seldom, or never, to attempt influence, through ingenious argument, or noisy declamation. Hence, few

have attempted to speak on questions. And these would natu-rally be the experienced and aged. A few voices from such quarters, unopposed, has always been sufficient to guide the clerk. If a contrariety of views appeared, it has not been the practice to continue the debate a long time, but if one party did not soon yield, to postpone the subject for further consideration. Hence, it has doubtless been usual for the clerks to look to leading men, principally, in gathering the sense of the meeting. And this practice being ancient and uniform, and withal countenanced by some of their most respected writers, and connected with their religious faith, strengthens one party in its opinion, not only that it is right for the clerk to do so, but that he may carry it so far, as to record a minute in opposition to the sense of the majority in numbers: 1 vol. *Evid.* 35, 64, 184, 333. The other party insist, on the contrary, that the government in a yearly meeting is strictly democratic; that all have equal rights and an equal voice, (1 vol. *Evid.* 43; 2 vol. *Ibid.* 244,) and that however much the young and inexperienced may, in times past, have yielded to the wise and aged, through courtesy, or from other causes, yet, upon a question of strict right, they are all equal. This usage, as it has existed, has no doubt been salutary in its influence, and it is highly expedient to preserve it. Indeed, it appears to be of almost vital importance to a religious society like this; into which, members are admitted without any public declaration of their faith, and even as a birthright. And yet it is difficult to apply it, and act upon it, under such circumstances as resulted in the present division. Here were two great parties, dividing, not only the numbers, but the talents, experience, and piety of this society, separated on important questions, and each tenacious of its opinions. How shall *their* controversies be decided? It is a general principle relating to all associations of men, that all the members of a meeting, who have a right to a voice at all, have a right to an *equal* voice, unless there be something in the terms of the association to vary those rights. It is conceded, that all the members of this society, have the right to attend the yearly meeting; and that the clerk *may* notice the opinions of all: 1 vol. *Evid.* 85, 333. How, then, is he to distinguish between them? The *usage* to accord superior weight

to superior piety and experience, has, indeed, been uniform, yet it seems to want that degree of *certainty* in its application, which an *imperative rule of government* requires. Who is to judge which members have the most wisdom, or the greatest share of the spirit of truth? Each individual may concede it to another, so as to yield his own opinion to him, if he will. But who shall judge of it for a whole assembly? Who shall allot among a great many individuals, their comparative weight? If any body, it must be the clerk. The result is, that the government, if not a democracy, very much resembles a monarchy. Neither party would be willing to call it the latter, unless by supposing the Great Head of the Church to preside, and rule therein. And this is, no doubt, the theoretic principle on this point. But who is to declare his decisions? We come back again to the clerk. Will he always declare them truly? To err, is human. He may be directed by light from above, or he may follow his own will. And this contest shows that neither party had any confidence in the infallibility of the clerk, under the unusual and trying circumstances which existed. The persons nominated by the two parties, were respectable men, of great worth and experience. They had both, for a long time, served the society very satisfactorily, in the most responsible stations,—those of clerk, and assistant clerk. But both had, or were suspected to have, partialities, or wishes of their own, to be gratified by the decisions of the yearly meeting. And the consequence was, that they were both objects of the greatest distrust. The "Orthodox" did not believe that John Comly could serve the meeting faithfully, and the "Hicksites" were equally dubious of the infallibility of Samuel Bettle.

This feature in the government of this society, whatever may be its precise limits, is intimately connected with their religious principles and doctrines: 1 vol. *Evid.* 64. They believe that the Head of the Church, when properly invoked, will shed his influence upon their meetings, and be "a spirit of judgment, to those who sit in judgment." Hence, the clerk is suffered to gather *the feeling and sense* of a meeting, from those who have long manifested a spiritual walk and conversation, aided by the agency of the spirit of truth, in his own mind. But, it

84

is at least *possible*, that a meeting should be unfitted, in a measure, for this intercourse with the spirit; and that the clerk may be influenced by earthly passions, and have a will of his own to subserve, as well as that of the Great Head of the Church. Should such a case arise, it must be perceived that the beauty of this theory is marred, and the government becomes, *not what it was intended to be.* May it not be said, that in such case, the *condition* on which the power of the clerk and the minority is founded, is broken? But if it be, who is to declare whether such a case has, or has not, arisen? Or, what is to be the effect of an abuse of this power? Or, how is it to be relieved against? I find myself met by these questions, and others, connected with this important and delicate subject. And supposing that the decision of this cause does not require an investigation of them, I shall not attempt it. Hence, I wish not to be understood as intimating any opinion, as to the complaints of the Hicksite party; whether there were really any good grounds for them, or not; or, whether, if there were, it would justify the course they took, or save them from the legal consequences of a secession. I would only observe, further, on this branch of the subject, that were this *a mere naked trust*, to be performed *immediately*, by the yearly meeting, I think I should have no hesitation to award it to the Arch street meeting; that being, in point of form at least, the same meeting which was in existence at the time the trust was created. But the Chesterfield preparative meeting, with respect to this fund, may fairly be considered, not merely as a trustee, but as having a beneficiary interest, inasmuch as the fund is to be expended in the education of the children of such of its members as are poor. It is a subordinate meeting, the pretensions of which are to be settled, by its acknowledging one or the other of these yearly meetings as its head. There was some difficulty in selecting which it should acknowledge; and if the majority have mistaken the truth, and connected themselves with the wrong head, (supposing this to be a mere dispute as to government, or discipline,) I should feel very reluctant to conclude that they could have no further right or interest in the fund. But, as I before intimated, I mean not to form, or express an opinion on this subject; for, in surveying the pleadings and

testimony in this cause, the conviction urges itself strongly upon my mind, that there is another great distinction between these parties, which may be resorted to, to ascertain which is the true society of Friends, so far as the purposes of this case require the decision of that question. I mean the difference in *doctrine*.

Hendrickson, in his answer to the bill of interpleader, alleges that " the society of Friends, as a christian sect, hold doctrines in reference to christianity, which, like those of other sects, are in some measure, common to all christians, and in other respects, peculiar to themselves." And that " the following religious doctrines have always been held and maintained by them :" 1 vol. *Evid.* 30.

" In the first place, although the society of Friends have seldom made use of the word trinity, yet they believe in the existence of the Father, the Son or Word, and the Holy Spirit. That the Son was God, and became flesh,—that there is one God and Father, of whom are all things,—that there is one Lord Jesus Christ, by whom all things were made, who was glorified with the Father before the world began, who is God over all, blessed for ever,—that there is one Holy Spirit, the promise of the Father and the Son, the leader, and sanctifier, and comforter of his people, and that these three are one, the Father, the Word, and the Spirit. That the principal difference between the people called Quakers, and other protestant trinitarian sects, in regard to the doctrine of the trinity, is, the latter attach the idea of individual personage to the three, as what they consider a fair logical inference from the doctrines expressly laid down in the Holy Scripture. The people called Quakers, on the other hand, consider it a mystery beyond finite, human conception ; take up the doctrine as expressly laid down in the Scripture, and have not considered themselves warranted in making deductions, however specious.

" In the second place, the people called Quakers have always believed in the doctrine of the atonement ; that the divine and human nature of Jesus Christ were united ; that thus united, he suffered ; and that through his sufferings, death, and resurrection, he atoned for the sins of men. That the Son of God, in the fulness of time took flesh, became perfect man, according to

the flesh, descended and came of the seed of Abraham and Da-
vid; that being with God from all eternity, being himself God,
and also in time partaking of the nature of man, through him
is the goodness and love of God conveyed to mankind, and that
by him again man receiveth and partaketh of these mercies; that
Christ took upon him the seed of Abraham, and his holy body
and blood was an offering and a sacrifice for the sins of the whole
world.

"In the third place, the people called Quakers, believe that
the Scriptures are given by inspiration, and when rightly inter-
preted are unerring guides; and to use the language adopted by
them, they are able to make wise unto salvation, through faith
which is in Jesus Christ. They believe that the spirit still ope-
rates upon the souls of men, and when it does really and truly
so operate, it furnishes the primary rule of faith. That the
Scriptures proceeding from it, must be secondary in reference to
this primary source, whence they proceed; but inasmuch as the
dictates of the spirit are always true and uniform, all ideas and
views which any person may entertain repugnant to the doc-
trines of the Scriptures, which are unerring, must proceed from
false lights. That such are the doctrines entertained and adopt-
ed by the ancient society of Friends, and that the same doctrines
are still entertained by the Orthodox party aforesaid, to which
party this defendant belongs. That these doctrines are, with the
said religious society, fundamental; and any individual enter-
taining sentiments and opinions contrary to all, or any of the
above mentioned doctrines, is held not to be in the same faith
with the society of Friends, or the people called Quakers, and is
treated accordingly." And he further alleges, that previous to
the separation, the society became divided into two parties, one of
which is called the Orthodox, and the other the Hicksite, and
that "they differ essentially from each other in religious doc-
trines;" and especially with respect to the doctrines above stated
That the Orthodox party hold to them, but that the Hickite par-
ty do not adopt and believe in them, but entertain opinions en-
tirely and absolutely repugnant and contrary thereto."

Decow, in his answer, alleges, that "the society of Friends
acknowledge no head but Christ, and no principle of authority

or government in the church but the love and power of God ope-
rating upon the heart, and thence influencing the judgment, and
producing a unity of feeling, brotherly sympathy and conde-
scension to each other.   The great fundamental principle of the
society—the divine light and power operating on the soul—being
acknowledged by all its members as the effective bond of union ;
the right of each individual to judge of the true meaning of
Scripture testimony, relating to the doctrines of christianity, ac-
cording to the best evidence in his own mind, uncontrolled by
the arbitrary dictation of his equally fallible fellow man, hath
been as well tacitly as explicitly, acknowledged by the society :
1 vol. *Evid.* 43, 45, 51.   And that the rules and regulations of
the system of discipline, adopted by the society, "relate partly
to the preservation of a decent and comely order in its internal
polity ; partly to the observance of the principles of morality and
justice, by all belonging to it ; and partly to the maintenance of
its peculiar testimonies."

He further alleges, that "the Chesterfield preparative meeting
of Friends at Crosswicks, to which he belongs, is the same Ches-
terfield preparative meeting of Friends at Crosswicks, under
whose care the said school fund was placed by the contributors
thereto, and are identified with them in due and regular succes-
sion, and are a part of the ancient society of Friends.   That
they believe in the Christian religion, as contained in the New
Testament, and as professed by ancient Friends, and adhere to
the religious institutions and government of the society of
Friends ; and bear the same cardinal testimonies to the whole
world, as are held most important and characteristic in the said
society ; among which are, a testimony against war—a hireling
ministry—against taking oaths—against going to law with
brethren—and a concern to observe the golden rule, do unto all
men as we would they should do unto us."

It is perceived, that each party claims for the meeting which
appointed him, an adherence to the ancient faith of Friends ; al-
though they differ in this, that one points out certain doctrines,
which he considers as parts of that faith, and that they are es-
sential parts ; while the other, without *directly* denying these to
be the doctrines of Friends, or that his party in the society hold

*July, 1832.*

———

Hendrickson
v.
Decow.

doctrines repugnant thereto, contents himself with alleging that "they believe in the christian religion, as contained in the New Testament, and as professed by ancient Friends;" and their adherence to their peculiar testimonies, some of which are specified; and distinctly advances "the right of each individual to judge of the true meaning of Scripture testimony, relating to the *doctrines* of christianity, according to the best evidence in his own mind." And by enumerating other objects of discipline, he would give us to understand that this is a right, the exercise of which is beyond the control of the discipline of the society.

There is nothing characteristic in "a belief in the christian religion, as contained in the New Testament." All sects of christians, however widely separated, unite in professing this. But if I can understand the liberty claimed in this answer for the members of the society, it is, that they may interpret the Scriptures, in reference to the doctrines of the trinity, and of the divinity and atonement of Jesus Christ, as the light within them shall direct.

But although Decow, in his answer, has, in some measure, declared the faith of the party to which he belongs, yet he denies that this, or any other court, has a right to institute an inquest into the consciences or faith of members of religious associations. But can this denial be well founded. May this fund be divided, and subdivided, as often as this body shall separate. And parts of it, from time to time, be diverted from its declared purpose, and appropriated to the education of the children of persons connected with other religious persuasions, or of no religion at all. And yet that no court can control it? Surely, this cannot be. This trust can be exercised only by a meeting of the *religious society of Friends*. The fund can be *used* only in the education of the children belonging to a meeting of that society. And when, as on this occasion, two distinct bodies, which have separated on points of discipline, or doctrine, or both, come before the court, and each claim the *guardianship* and *use* of this fund, as belonging to the society of Friends; this court may, surely, inquire into the badges of distinction by which the society of Friends are known; and if they are characterized by established doctrines, we may inquire what those are, and whether

they belong to one, or both of these parties. This power is dis-
tinctly laid down, in a recent case before the house of lords, in
which lord chancellor Eldon says, " It is true, the court cannot
take notice of religious opinions, with a view to decide whether
they are right or wrong, but it may notice them as facts, pointing
out the ownership of property : 1 *Dow's Rep.* 1 ; 2 *Jacob and
Walk.* 248 ; 3 *Merrivale,* 412, 419 ; 7 *Serg. and Rawle,* 460 ;
3 *Dessaussure,* 557.

In searching for the doctrines of this society, it is, in my opi-
nion, not necessary to inquire whether there were any differences
of opinion among their ancient writers, provided the society had
for a long time before this fund was established, promulgated as
a body, their religious doctrines, and had settled down in harmo-
ny under them. It is a body of Friends, with its settled and
known characteristics, at that time, which is contemplated in the
trust.

The society of Friends, or Quakers, as they were called by
their opponents, had its origin in England about the middle of the
seventeenth century ; a time much distinguished for religious in-
quiry, in many parts of Europe. It was composed of persons
who could not conscienciously agree with the existing sects, in
their doctrines, modes of worship, or practices, and who found
themselves drawn together by a unity of faith and feeling. They
called themselves christians and protestants, but appear to have
required from those seeking to become united with them, no for-
mal profession of faith, as a test of principle to qualify them for
admission ; looking at their works as evidence of their christian
faith, and their practice, and support of their peculiar testimonies,
as evidence of their Quakerism. As they increased in numbers,
and attracted the attention of the civil authorities, their princi-
ples became the subject of inquiry, and of misrepresentation, by
reason of which, they were exposed to reproach and persecution,
and it became necessary for them to come out and avow their
leading doctrines to the world. This was done by their leaders
and principal men, professing to act in behalf of the society, on
several occasions. George Fox, who is generally regarded as
the founder of the sect, travelling in the island of Barbadoes, be-
ing assailed with these misrepresentations, and especially with

this, that they denied God, Christ Jesus, and the Scriptures of truth; "with some other Friends, drew up a paper to go forth in the name of the people called Quakers, for the clearing of truth and Friends from those false reports." It was addressed to the governor of Barbadoes, with his counsel and assembly. In this paper, the belief of Friends in God, the divinity and atonement of Jesus Christ, and the inspiration of the Scriptures, is most fully and explicitly avowed: 2 vol. *Fox's Jour.* 145, 138, 316, 338, 367; 1 vol. *Ibid.* 4, 56, 57. Elias Hicks intimates that George Fox, for prudential reasons, disguised his real sentiments: 1 vol. *Evid.* 116; 2 vol. *Ibid.* 417. But this ill agrees with the history of Fox, and I suspect with the belief of Friends, as to his real character. Sewell has given his character in this respect, as drawn by a cotemporary, in these words. "He was, indeed, a heavenly minded man, zealous for the name of the Lord, and preserved the honor of God before all things. He was valiant for the truth, bold in asserting it, patient in suffering for it, unwearied in laboring in it, steady in his testimony to it, immoveable as a rock:" 2 vol. *Sewell's Hist.* 464.

In 1689, the British parliament passed an act for exempting protestant dissenters from certain penalties, by which the Quakers had suffered for many years. To obtain the benefit of this exemption, they subscribed, among other articles, the following: "I, A. B. profess faith in God, the Father, and in Jesus Christ, his eternal Son, the true God, and in the Holy Spirit, one God, blessed for evermore; and do acknowledge the Holy Scriptures of the Old and New Testament, to be by divine inspiration." The historian adds, "we now see the religion of the Quakers acknowledged and tolerated by an act of parliament:" 2 vol. *Sewell,* 447.

In 1693, the doctrines of the society being misrepresented by George Keith and others, "they found themselves obliged to put forth their faith anew in print, which they had often before asserted, both in words and writing, thereby to manifest that their belief was really orthodox, and agreeable with the Holy Scriptures:" 2 vol. *Sewell,* 471. And being charged with some socinian notions, a short confession of faith, signed by one and thirty persons, of which George Whitehead was one, was, in

December following, presented to the parliament : 2 *Sewell*, 483, 499 ; 1 vol. *Evid.* 297 ; 3 *Gough's Hist.* 386. In these public declarations, we find these enumerated doctrines recognized and avowed. At that time, and afterwards, the society of Friends in this country, acknowledged the London yearly meeting as their head, and appeals were taken from their meetings in this country, and decided there : 1 vol. *Evid.* 95 ; 1 *Proud's Hist. Penn.* 369.

Of their early writers, none seems to have been held in higher estimation than Robert Barclay. In his "Apology,"* purporting to be an explanation and vindication of the principles and doctrines of the people called Quakers, these principles are distinctly exhibited as parts of their faith.

He also published a catechism and confession of faith, which purport to contain " a true and faithful account of the principles and doctrines, which are most surely believed by the churches of Christ, in Great Britain and Ireland, who are reproachfully called by the name of Quakers." In these, the doctrines above mentioned, are most fully and explicitly taught and professed.†

It is in evidence, that Barclay's Apology, and his Catechism and Confession of Faith, purporting as aforesaid, have been published and circulated by the Philadelphia yearly meeting, by the use of its own funds, and as their minutes express, " for the service of truth," as early as the year 1701, and on several occasions since : 1 vol. *Evid.* 76, 297.

There is much other evidence laid before us, by documents and witnesses, confirming that which I have thus briefly noticed. But I shall pass it over, merely referring, however, to the letters from Elias Hicks to Phebe Willis and Thomas Willis, written in 1818, in which he distinctly intimates that the society's belief of the Scriptures, and of the divinity of Christ, which he had been taught from his cradle, whatever was *his* belief at that time, was fully in accordance with the pretensions of the Orthodox party : 2 vol. *Evid.* 419, 420, 421.

* See ninth edition, published at Philadelphia in 1775, pages 86, 139, 141, 185, 203, 204, 211, 226, 572, 573, 574. Also in his "Anarchy of the Ranters," pages 1, 2, 3, 29, 30.

† See pages 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 104, 106, 107, 108, 111, 134.

85

I think it sufficiently established, that these doctrines have been avowedly and generally held by the society. And, indeed, they have treated the Scriptures with a degree of reverence, uncommon, even among christians. Feeling it presumptuous to speculate upon what is obscure, they have, in *doctrinal matters,* adopted its explicit language, but rejected the ingenious deductions of men; they have been unwilling to be wise above what is written. And in matters of *practice,* they have endeavored to apply its precepts literally; and this is the foundation of their peculiar testimonies.

But are these doctrines *essential?* There is strong evidence of this, in the very nature of the doctrines themselves. When men form themselves into associations for the worship of God, some correspondence of views, as to the nature and attributes of the being who is the object of worship, is necessary. The difference between the pagan, the mahometan, the christian, and the Jew, is radical and irreconcilable. The two latter worship the same God; but one approaches him through a Mediator, whom the other regards as an impostor; and hence, there can be no communion or fellowship between them. Christians have become separated into various sects, differing more or less in their doctrines. In looking at the history of these sects, I am by no means convinced that there was, in the nature of things, any necessity for all the divisions which have taken place. Many of the controversies in the church, have doubtless arisen from minute and subtle distinctions in doctrine, which have been maintained, not only with much ingenuity, but with much obstinacy and pride; and which, by this mixture of human frailty, have been the cause of angry, and often bloody dissensions. And whenever the civil government, or the prevailing party, in a religious society, have formed creeds, and required professions of faith, descending to these minute points, it has necessarily caused the separation of those, or at least the honest part of them, who could not believe up to the precise line of orthodoxy. Hence, no doubt, many separations have taken place in churches, upon points of doctrine, which would never have disturbed the harmony of the association, had not public professions of faith been required, descending into minute and non-essential particulars.

In these days, many christians find themselves able to unite in worship with those of different denominations, and to forget the line of separation between them. But, although unnecessary divisions have taken place, it by no means follows, that there are not some points of faith, which must be agreed in, in order that a religious society may harmonize in their public worship and private intercourse, so as to experience the benefits of associating together. Of this description, is the belief in the atonement and divine nature of Jesus Christ. He, who considers Him to be divine; who addresses himself to Him as the Mediator, the Way, the Creator, and Redeemer; who has power to hear, and to answer, to make and to perform his promises, cannot worship with him, who regards him as destitute of this nature, and these divine attributes. Nor can the latter unite in a worship which he conceives to be idolatrous.

And with respect to the inspiration of the Scriptures. The belief in the divine nature and atonement of Jesus Christ, and indeed of the christian religion itself, is intimately connected with that of the divine authority of the sacred writings. "Great are the mysteries of godliness." And of all the truths declared in Holy Writ, none are more mysterious than the nature, history, and offices of Jesus Christ. The mind that contemplates these truths as based on mere human testimony, must range in doubt and perplexity, or take refuge in infidelity. But if they are regarded as the truth of God, the pride of human reason is humbled before them. It afterwards exerts its powers to understand, and to apply, but not to overthrow them. Faith may repose in confidence upon them, and produce its fruits in a holy life. To a people like the Friends, who pay so much attention to the light within, but who at the same time, acknowledge the deceitfulness of the human heart, and the imperfection of human reason; when they once fix their belief on the testimonies of Scripture, as dictated by the spirit of truth, they necessarily become precious; as the landmarks, setting bounds to principle and to action; as the charts, by which they may navigate the ocean of life in safety; as the tests, by which they may examine themselves, their principles, and feelings, and learn *what spirit they are of.* For, in the language of Barclay, "they are certain,

that whatsoever any do, pretending to the spirit, which is contrary to the Scriptures, should be accounted and reckoned a delusion of the devil." Hence, their book of discipline earnestly exhorts all parents and heads of families, to cause the diligent reading of the Scriptures by their children ; (*Disc.* 100 ;) to instruct them in the doctrines and precepts there taught, as well as in the belief of the inward manifestation and operation of the Holy Spirit upon their own minds ; and to prevent their children reading books or papers, tending to create the least doubt of the authenticity of the Holy Scriptures, or of those saving truths declared in them : *Disc.* 12. And hence, by the same discipline, ministers are liable to be dealt with, who shall misapply, or draw unsound inferences or conclusions from the text : *Ibid.* 62. And a periodical inquiry is directed to be made, whether their ministers are sound in word and doctrine : *Ibid.* 95.

I have before said, that their great regard for the Scriptures, and desire to comply with them literally, is the foundation of their peculiar testimonies. *These* are acknowledged by Decow and his party to be essential, and a departure from them a ground of disownment : 1 vol. *Evid.* 43, 385. Does not a strong argument result from this, that they regard the Scriptures as divine truth, and that this belief is essential ? When their writers would defend these testimonies, they do not refer us to the light within. They do not say that this has taught them that oaths are unlawful, &c. But they point to passages of Scripture, as authority, and *undoubted* authority, on these subjects. But why are they authority ? Because they are the truth of man ? No. Friends spurn at the dictation of their equally fallible fellow man. But because they are the truth of God. Or, in the language of Fox, " We call the Holy Scriptures, as Christ, the apostles, and holy men of God called them, the words of God : 2 vol. *Fox's Jour.* 147 ; 1 vol. *Evid.* 78. Can it be that the rejection of, or nonconformity to, particular passages, is ground of disownment, and yet that their members are at liberty to reject the whole ? What would this be but to permit their fellow man to select and garble as they please, and dictate what *should be believed*, and what *might be* disbelieved ?

These testimonies regard the *practices* of the members. Ro-

bert Barclay did not consider deviations from them, as the *sole* causes of disownment. He says, " we being gathered together into the belief of certain principles and doctrines; those principles and doctrines, and the practices necessarily depending upon them, are, as it were, the *terms* that have drawn us together, and the *bond* by which we become centred into one body and fellowship, and distinguished from others. Now, if any one, or more, so engaged with us, should arise to teach any other doctrine or doctrines, contrary to these which were the ground of our being one, who can deny, but the body hath power, in such a case, to declare this is not according to the truth which we profess; and therefore we pronounce such and such doctrines to be wrong, with which we cannot have unity, nor yet any more spiritual fellowship with those that hold them? And so cut themselves off from being members, by dissolving the very bond by which they were linked to the body: *Anarchy of the Ranters*, 54 to 59. And after proving the soundness of these views from Scripture and reason, he concludes as follows: " So that from all that is above mentioned, we do safely conclude, that where a people are gathered together into the belief of the principles and doctrines of the gospel of Christ, if any of that people shall go from those principles, and assert things false and contrary to what they have already received ; such as stand and abide firm in the faith, have power by the spirit of God, after they have used christian endeavors to convince and reclaim them, upon their obstinacy, to separate such, and to exclude them from their spiritual fellowship and communion. For otherwise, if these be denied, farewell to all christianity, or to the maintaining of any sound doctrine in the church of Christ." And, surely, these remarks must be applicable to doctrines as *radical* as those above stated.

In 1722, the yearly meeting of Philadelphia issued a testimony, accompanying Barclay's catechism and confession of faith, which they styled " The ancient testimony of the people called Quakers, revived ;" in which, after a long enumeration of evil practices which the apostles testified against, and through which some fell away, they add, " and some others, who were then gathered into the belief of the *principles and doctrines* of the

gospel of Christ, fell from *those principles*, as some have done in our day; in which cases, such as stood firm in the faith, had power, by the spirit of God, after christian endeavors to convince and reclaim these backsliders, to exclude them from our spiritual fellowship and communion, as also the privileges they had as fellow members; which power we know by *good experience*, continues with us, in carrying on the discipline of the church in the spirit of meekness :" 2 vol. *Evid.* 11. And in answer to what was said in argument, as to the *extent* of the discipline appearing in its introductory paragraph, I would observe that this testimony was issued soon after that introduction commences, by referring to it, and may be considered as in a measure explanatory of it. But the discipline itself is not silent on this subject. Its object is declared to be, " that all may be preserved in *unity of faith* and *practice*." Now, what is unity of faith ? Does it not require unity of *interpretation ;* unity of *views*, of the meaning of texts of Scripture, involving important doctrines ? It does not require submission to the dictation of others. But it does require an accommodation of opinion to a common standard, in order that they may be of *one* faith. This need not extend to subordinate matters; but liberal as the society has always been in this respect, it has spread before its members the Catechism and Confession of Faith and Apology of Barclay, as guides to opinion, and it will not suffer *even the less essential* doctrines there promulgated, to be questioned, if it be done in a contentious or obstinate spirit, without subjecting the offender to discipline. This is plainly indicated in the *testimony* above referred to : *Disc.* 12. And with respect to the more important doctrines now in dispute, the discipline expressly says, "Should any deny the *divinity of our Lord and Saviour Jesus Christ, the immediate revelation of the Holy Spirit*, or the *authenticity of the Scriptures ;* as it is manifest *they are not one in faith with us*, the monthly meeting where the party belongs, having extended due care for the help and benefit of the individual without effect, ought to declare the same, and issue their testimony accordingly :" *Disc.* 23 ; 1 vol. *Evid.* 385.

In addition to all this, several respectable witnesses testify that the denial of these doctrines has always been held to be ground

of disownment, and they adduce many instances of actual dis-
ownment for these causes : 1 vol. *Evid.* 60, 99, 108, 171, 306.

Upon reviewing the testimony, I am satisfied that the society
of Friends regard these doctrines as *essential*, and that they have
the power, by their discipline, to disown those who openly call
them in question.

But do the Arch street meeting, and its subordinate meetings,
hold to these doctrines? It is so alleged ; and it is not denied.
The denial, if it be one at all, is that these are established doc-
trines of the society of Friends. The controversies between the
parties, so far as they were doctrinal, show that the party called
" Orthodox" insisted on these doctrines. The offensive extracts
of the meeting for sufferings, declares them : 1 vol. *Evid.* 217 ;
2 vol. *Ibid.* 414. And these have been published by the yearly
meeting of that party, in 1828. And there is much testimony
by witnesses, that the Arch street meeting adheres to them,
(1 vol. *Evid.* 60, 99,) and none to the contrary.

So that it appears to me, that Hendrickson has sufficiently es-
tablished that the preparative meeting at Chesterfield, which he
represents, may, so far as respects doctrine, justly claim to be of
the society of Friends.

But it is insisted, that the other party stands on equal ground
in this respect; that they are now, or certainly have been, in
unity with that society ; a society in which no public declaration
of faith is necessary ; and that hence, independent of any proof
they may have offered, they are to be presumed to be sound in
the faith. And that any inquiry into their doctrines, further than
as they have publicly declared them, is inquisitorial, and an in-
vasion of their rights of conscience.

If a fact be necessary to be ascertained by this court, for the
purpose of settling a question of property, it is its duty to ascer-
tain it. And this must be done by such evidence as the nature
of the case admits of : 3 *Merrivale,* 411, 413, 417 ; 3 *Des-
saussure,* 557.

I have already stated, that the answer of Decow appeared to
me indirectly to deny that the faith of Friends embraces the
enumerated doctrines insisted on by Hendrickson, and to claim
freedom of opinion on those points. I feel more assured that this

is the true meaning of the answer, from the course taken in the cross-examination of the witnesses, in which an evident effort appears, to show a want of uniformity among ancient writers of the society, when treating on these subjects; and also, from the grounds taken by the counsel in the argument of this cause.   It was here most explicitly, and I may add, most ingeniously and eloquently insisted, not only that these doctrines *do not* belong to the faith of Friends, but that they *cannot ;* because they must interfere with another acknowledged fundamental principle of the society—the guidance of the light within.   Now if it be established, that these doctrines are part of the religious faith of Friends, can it be necessary, under these pleadings, to *prove* that Decow's party do not hold to the faith of Friends ?   Decow says, " my party, or preparative meeting, hold the faith of Friends, but these doctrines are no part of that faith ; therefore we do not, as Friends, hold to these doctrines."   But Friends do hold these doctrines:  Decow's party does not ;  therefore they are not *one*, with Friends, in religious doctrine.   And it will not materially vary the argument, that they are *at liberty* to hold them, or not, as the light within shall direct.   It is *belief* which gives character to a sect, and right of membership to an individual.  *Liberty* has the same practical effect as *unbelief*, when applied to an essential doctrine of a religious society.   An individual cannot avail himself of his faith in any doctrine which he is at liberty to believe or not.  Were it otherwise, we might all be members of any religious society whatever.

But as I may have mistaken the meaning of Decow's answer, which is certainly not very explicit in this particular, I will next turn to the evidence, and discover, if I can, what is the fair result of the examination of that.

Decow offers no testimony respecting the belief of his party in the particular doctrines in question.   His witnesses refuse to answer on these points, (1 vol. *Evid.* 387, 381, 406, 475 ; 2 vol. *Ibid.* 13, 90, 206,) and his party protest against all creeds, or public declarations of faith, as an abridgement of christian liberty.  Having no such public declaration to resort to, we must ascertain the truth from other sources, so far as it is necessary to be ascertained.

Several public addresses were issued by the party called Hicks-
ite, about the time of the separation, setting forth their reasons
for it. In that of April twenty-first, 1827, it is declared that,
"the unity of this body is interrupted, that a division exists
among us, developing in its progress, *views which appear in-
compatible* with each other, and feelings averse to a reconcilia-
tion. *Doctrines* held by one part of the society, and which we
believe to be *sound* and edifying, are pronounced by the other
part to be *unsound* and spurious." A prominent complaint, in
these papers, is, that Friends travelling in the ministry, had been
publicly opposed in their meetings for worship, and labored with,
contrary to the discipline. Upon looking into the testimony, we
find that the prominent individual who furnished occasion for these
complaints, is Elias Hicks; and that the interruptions and treat-
ment of him, deemed exceptionable, had their origin in the doc-
trines which he preached: 1 vol. *Evid.* 308, 474, 478. Can it
be denied, then, that differences in doctrine existed, and differences
of that serious nature calculated to destroy the unity of the socie-
ty, and which had their full share in producing the separation
which took place.

Decow has introduced several witnesses, who testify, and no
doubt conscientiously, that they believe they hold the ancient
faith of Friends, but they refuse to tell us what this faith is, in
reference to these enumerated doctrines. We cannot give much
weight to *opinion*, where we should have *facts*. The belief
should refer to specific doctrines, that the court may judge as well
as the witnesses, whether it was the ancient faith or not. The
court, in that case, would have an opportunity of estimating the
accuracy of the knowledge upon which the belief is founded.

How stands the case, then, upon the proofs? A fund was cre-
ated for the education of the poor children of a certain prepara-
tive meeting of the religious society of Friends. That body has
lately become separated. *Its unity is broken; the views of its
members are incompatible; and doctrines held by one party
to be sound, are pronounced by the other party to be unsound.*
And two distinct meetings exist at this time, and each claims the
guardianship and use of this fund. For the safety of the debtor,
these parties have been directed to interplead, and to show their

July, 1832.

Hendrickson
v.
Decow.

respective pretensions to be *a preparative meeting of Friends.* One of them sets out certain doctrines as characteristic of the society, and that they adhere to them, and that the other party does not. They go on and prove their case, so far as respects themselves. The other party allege that they hold the faith of Friends; but instead of proving it, they call upon their adversaries to prove the contrary. In my opinion, it was incumbent upon each of the parties to make out their case, if they would stand upon equal terms, on this question of doctrine. And especially upon this preparative meeting, connected as it is with a yearly meeting, which, in point of form at least, is not the yearly meeting that was in existence at the creation of the fund; and which has furnished *prima facia* evidence that it has withdrawn, or separated from that meeting, in consequence of disputes in some measure doctrinal. The court will not *force* either party in this cause to declare or prove their religious doctrines. But if doctrines be important, the party which would avail themselves of their doctrines, must prove them. They are peculiarly within their knowledge, and although they may have the right to withhold them, yet if they do, they cannot expect success in their cause. The money must be awarded to that party which supports, by proper proof, its pretensions to it.

Under this view of the case, I deem it unnecessary to attempt any further investigation of the doctrines of the party called Hicksite. And if ascertained, I certainly would not inquire, as an officer of this court, whether they are right or wrong. It is enough, that *it is not made to appear* that they correspond with the religious faith of the society of Friends.

I would merely add, that if it be true, that the Orthodox party believe in the doctrines above mentioned, and the Hicksite party consider that every member has a right to his own belief on those subjects, they well might say that their differences were destructive of their *unity.* If their members and ministers exercise perfect freedom of thought and speech on these points, their temples for worship, and it is to be feared, their own hearts, would soon be deserted by the peace-loving spirit of their Master. There is an essential incompatibility in adverse views, with regard to these doctrines. The divinity of Christ, and the au-

thenticity of the Scriptures, cannot be debated in a worshipping assembly, without defeating the proper purposes of meeting together.

And upon this supposition, too, the *propriety*, as well as *legality*, of this court's noticing the doctrines of the preparative meeting, which is to superintend the expenditure of this fund, is too manifest to admit of doubt. We have already seen, by reference to the discipline of this society, with what earnestness they endeavor to educate their children in the knowledge and belief of the Scriptures; and whoever looks into that discipline, cannot but discover their anxiety to train them up in their own peculiar views of the christian religion. To effect these purposes, their yearly meeting has directed their attention to the subject of *schools*. " The education of our youth," says the discipline, " in piety and virtue, and giving them useful learning under the tuition of religious, prudent persons, having for many years engaged the solid attention of this meeting, and advices thereon having been from time to time issued to the several subordinate meetings, it is renewedly desired, that quarterly, monthly and preparative meetings may be excited to proper exertions for the institution and support of schools; for want of which, it has been observed, that children have been committed to the care of transient persons of doubtful character, and sometimes of very corrupt minds." " It is, therefore, indispensably incumbent on us, to guard them against this danger, and procure such tutors, *of our own religious persuasion*, as are not only capable of instructing them in useful learning, to fit them for the business of this life, but to train them in the knowledge of their duty to God, and one towards another." Under this discipline, and by the exertions of superior meetings, (2 vol. *Evid*. 345, 346, 436, 437,) as well as of the members of the Chesterfield preparative meeting, this school at Crosswicks was established, and this fund raised for its support. It thus appears, that the fund was intended to promote, not merely the secular knowledge of the pupils, but their growth in the religious principles deemed fundamental by this people; or at least, to prevent, through the instruction of teachers of other religious principles, or wholly without principle, the alienation of the minds of their children

from the faith of their fathers. Could these meetings, and these contributors, have contemplated that this fund should fall into the hands of men of opposite opinions, or of no opinions ? Could those men, who acknowledged the obligation of this discipline, enjoining, as it does, upon parents and heads of families, "to instruct their children in the doctrines and precepts of the christian religion, as contained in the Scriptures," and "to prevent their children from having or reading books and papers, tending to prejudice the profession of the christian religion, or, *to create the least doubt concerning the authenticity of the holy Scriptures,* or of those saving truths declared in them, lest their infant and feeble minds should be poisoned thereby ;" I say, is it possible such men could have expected that their children should be taught by Elias Hicks, that the Scriptures "have been the cause of four-fold more harm than good to christendom, since the apostles' days ;" and that, "to suppose a written rule *necessary,* or *much useful,* is to impeach the divine character ?" Or, that they should be taught by him, or by any one else, that each individual must interpret them for himself, entirely untrammelled by the opinions of man ; and that the dictates of the light within are of paramount authority to Scripture, even when opposing its precepts ? Surely this would be a breach of trust, and a perversion of the fund, which the arm of this court not only has, but ought to have, power to prevent.

I would not be understood to impute the doctrines of Elias Hicks to that party which unwillingly bears his name. Nor do I mean to intimate that *they* would abuse this trust. But I have endeavored to show, that doctrines may justly have an influence on the decision of the question now before us. And without coming to any conclusion with respect to *their* doctrines, I am of opinion that this fund should be awarded to that meeting which has shown, at least to my satisfaction, that they agree in doctrine with the society of Friends, as it existed at the origin of this trust.

I do, therefore, respectfully recommend to his excellency the chancellor, to decree upon this bill of interpleader, that the principal and interest due on the said bond, of right belong, and are payable to, the said Joseph Hendrickson ; and that he be permit-

ted to proceed on his original bill of complaint, or otherwise, according to the rules and practice of the court of chancery.

GEORGE K. DRAKE.

THE CHANCELLOR decreed accordingly, in favor of Hendrickson the complainant, for foreclosure and sale of the mortgaged premises, according to the prayer of the original bill.